Alwan Abdullah **MUHAMMAD,**
Appellant,

v.

**The STATE of Texas, Appellee.**

No. 08–98–00399–CR.

Court of Appeals of Texas,
El Paso.

May 24, 2001.

Charles Louis Roberts, Lauren K.S. Murdoch, El Paso, for appellant.

Jaime E. Esparza, Dist. Atty., Karen L. Landinger, Asst. Dist. Atty., El Paso, for State.

Before BARAJAS, C.J., LARSEN, and CHEW, JJ.

## OPINION

LARSEN, Justice.

This case involves exclusion of expert psychological evidence during a punishment trial. Alwan A. Muhammad pleaded guilty to the murder of Nereida Flores, electing to have a jury assess punishment.

The trial court sentenced Muhammad, in accordance with the jury's verdict, to life imprisonment and a $10,000 fine. Muhammad appeals, claiming that the trial court abused its discretion in excluding the testimony of his psychologist. Finding error affecting defendant's substantial rights, we reverse and remand for a new punishment trial.

### FACTS

The facts of this case are not disputed. In 1997, Muhammad met Nereida Flores at DJ Plastics, an injection molding factory in El Paso Texas where they both worked. They became romantically involved, and in September 1997, Muhammad moved in with Flores and her children. Within a month, the relationship began to sour. In October, Muhammad moved in with another coworker, Thomas McCrory. On the morning of November 5, 1997, Flores met Muhammad at McCrory's apartment to take him to the post office and then to work. The two began arguing, the altercation escalated and became violent. Muhammad grabbed his gun from the bedroom closet and shot Flores. He then exited the apartment and had neighbors call 911. He did not deny shooting Flores, nor did he attempt to flee. His demeanor after the shooting was described by several State witnesses as "calm."

At trial, Muhammad attempted to call James W. Schutte, a forensic psychologist, as an expert witness to testify regarding his administration to Muhammad of three psychological tests: the Psychopathy Checklist–Revised, the Minnesota Multiphasic Personality Inventory II (MMPI II), and the Millon Clinical Multiaxial Inventory III (MCMI III) as well as an interview in which Schutte inquired about Muhammad's family, health, and educational history. In voir dire examination outside the jury's presence, analyzing the results of the psychopathy checklist, Schutte concluded that Muhammad was not a psychopath, would be a good candidate for rehabilitation, had "an extremely low risk for reoffending," and would have little or no difficulty with discipline. Analyzing the results of the MMPI II, Schutte opined that Muhammad showed no signs of antisocial personality, that he is shy, introverted, tends not to express emotions openly, tends to be submissive, tends to believe he feels more intensely than others, tends towards a rigid self-view, and to have high moral standards. Analyzing the results of the MCMI III, Schutte concluded Muhammad is submissive, has low self-esteem, a pessimistic view of the future, tends to feel he was placed on this earth to suffer, tends to allow others to take advantage of or mistreat him, and has little hope for the future. Schutte also testified that, based upon these test results, Muhammad is not someone who is at risk to violate the law in the future.

Defense counsel offered this testimony as relevant to the issue of whether Muhammad was an appropriate candidate for probation, and as rebuttal to the State's characterization of the defendant as calm and unrepentant after the shooting. The trial court excluded the expert's testimony in its entirety. As grounds for his ruling, the trial court responded thusly to defense counsel:

Defense counsel: I would like to know why. I would like to know if the Court found that it was unreliable testimony or that it was not relevant to any of the issues of the punishment phase of this trial, or if the Court concluded that he was not qualified as an expert.

The Court: All those reasons are good.

Defense counsel: Because in order for me to show that this Court abused its discretion, I need to have some basis as to why it was excluded so that the appel-

late court just doesn't guess and try to figure out why it was excluded. So if the Court is telling me each and every one of those is one of the reasons that he was not allowed to testify, then I'm satisfied. And I appreciate the Court responding.

The Court: And also the Rules of—the Rules of Evidence and the Code of Criminal Procedure 36–36.36?[1]

## STANDARD OF REVIEW

■ We review the trial court's decision to exclude evidence under an abuse of discretion standard.[2]

### Exclusion of psychological evidence

In six interrelated issues,[3] Muhammad urges that the trial court erred in excluding Dr. Schutte's testimony because it was germaine to two punishment issues: that Muhammad was unable to outwardly display emotions, thus explaining his apparent calm following the shooting; and Muhammad's amenability to community supervision rather than incarceration. Upon careful examination of the facts and law, we must agree.

■ We begin by noting that Muhammad pleaded guilty, and therefore the only question before the jury was punishment. At the punishment phase of trial,

[E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried.... A court may consider as a factor in mitigating punishment the conduct of a defendant while participating in a program under Chapter 17 as a condition of release on bail.[4]

Admissibility of evidence at the punishment phase of a non-capital trial is a function of policy rather than relevancy.[5] Evidence admitted to inform the jury's punishment decision is not a question of logical relevance, as there are no distinct facts to be proven.[6] Mitigating circumstances relevant to punishment are circumstances which will support a belief that defendants who commit criminal acts that are attributable to such circumstances are less culpable than others who have no such excuse.[7] The Code of Criminal Procedure authorizes the trial court to admit punishment evidence "as to any matter the court deems relevant to sentencing...."[8] The trial court therefore enjoys wide latitude in admitting relevant evidence so long as its admission is other-

1. There is no TEX.CODE CRIM. PROC. 36.36.

2. *Avila v. State*, 954 S.W.2d 830, 837–38 (Tex. App.—El Paso 1997, pet. ref'd).

3. Issues One and Four simply urge that the trial court erred in excluding expert testimony. Issues Two and Five contend that the exclusion violated the Texas Constitution due course of law provision, Issues Three and Six that the exclusion violated the U.S. Constitution's due process guarantees under the Fifth and Fourteenth Amendments.

4. TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (Vernon Supp.2001).

5. *Schielack v. State*, 992 S.W.2d 639, 641 (Tex.App.—Houston [14th Dist.] 1999, pet. ref'd) (citing *Miller–El v. State*, 782 S.W.2d 892, 895 (Tex.Crim.App.1990)).

6. *Id.*

7. *Robison v. State*, 888 S.W.2d 473, 487 (Tex. Crim.App.1994).

8. TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (Vernon Supp.2001).

wise permitted by the rules of evidence.[9]

▇▇▇ Our analysis of the admissibility of expert testimony starts with Tex.R. Evid. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.[10]

Under Rule 702, the proponent of expert evidence must show, by clear and convincing proof, that the evidence proffered is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or determining a fact in issue.[11] To be considered reliable, evidence derived from a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied.[12] Among the factors the court may consider in establishing reliability are: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory or technique; (4) the potential rate of error; (5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying theory and technique can be explained to the court; and (7) the experience and skill of the person who actually applied the technique.[13] This list is neither exhaustive nor exclusive, and the ultimate inquiry into reliability should be flexible.[14] These rules on expert testimony are intended to relax the traditional barriers to opinion testimony.[15]

▇▇▇ When addressing the admissibility of "soft" scientific evidence, such as social sciences or fields based primarily upon experience and training as opposed to scientific method, including the psychological evidence proffered here, *Kelly*'s reliability requirements still apply but with less rigor than to the hard sciences.[16] Reliability of such evidence may be established by showing that: (1) the field of expertise involved is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field.[17] Finally, once a particular type of evidence is well established as reliable, a court may take judicial notice of that issue, and it may likewise take judicial notice of the validity of the technique applying that principle.[18]

### Relevance on issue of inability to display emotions

The State's theory of this case was that Muhammad committed a premeditated

**9.** *Mock v. State*, 848 S.W.2d 215, 225 (Tex. App.—El Paso 1992, pet. ref'd).

**10.** Tex.R. Evid. 702.

**11.** *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000).

**12.** *Kelly v. State*, 824 S.W.2d 568, 574 (Tex. Crim.App.1992).

**13.** *Id.* at 573; *Sexton v. State*, 12 S.W.3d 517, 519 (Tex.App.—San Antonio 1999, no pet.).

**14.** *Sexton*, 12 S.W.3d at 519.

**15.** *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim.App.1998).

**16.** *Id.*

**17.** *Id.*

**18.** *Weatherred*, 15 S.W.3d at 542 n. 4; *Epps v. State*, 24 S.W.3d 872, 879 (Tex.App.—Corpus Christi 2000, pet. ref'd).

murder and showed no remorse for his actions. In support of this position, the State presented evidence of Muhammad's "calm," "quiet" demeanor immediately after the shooting, that he never cried about his relationship with Flores, nor did he break down emotionally after the shooting. Immediately after the shooting, the responding police officer described Muhammad as "appearing to be casual. He didn't seem nervous or upset at all." He did not look like a person who had been through a traumatic event, nor like one who had lost control. His tone of voice was normal, and he did not seem worried about Flores's safety. He showed no signs of regret, nor did he make any comments indicating remorse. When asked later by Thomas McCrory, "Are you sorry about it or what, Man?" Muhammad responded, "It was her time to go." The State presented evidence that Muhammad bought a handgun in October 1997, almost a month before the shooting, and that he had talked with Thomas McCrory about killing Ms. Flores. Muhammad took a week off work shortly before the killing, spent about three days in his room burning incense, meditating, seeming "just calm."

Muhammad's position, as one would expect, was quite different. Although he pleaded guilty, he maintained that he had bought the gun to kill himself, and that he was terribly depressed and sad about his relationship with Flores. His roommate McCrory testified that upon learning there had been a shooting in the apartment, he assumed at first that Muhammad had killed himself because he had been so "bummed out" about the relationship with Flores. Muhammad testified that on the day of the shooting, Flores arrived at the apartment, still angry from an argument between them the night before. He asked her a question, she grew angry and pushed him, he fell, got up, pushed her back, and they started fighting. They had been in physical fights before this time, and both had been injured as a result. Muhammad described the fight:

> We started fighting down the hall. Somehow we wound up fighting all the way to the back bedroom and she was just yelling. I was yelling. I remember grabbing at the Sony play station controller. Started hitting me with it. I tried to take it from her hands. I remember her putting it around my neck pulling it. I remember working it out of her hands, slapping at her—God—pushing her. She fell face down. I put it around her neck. I remember pulling.
>
> [Why I did that was] anger, rage, because she did it to me. It's just—she had attacked me so many times before, it was just a reaction. Just a—I mean, I was fed up. The night before she tried to hit me with her Bronco in the parking lot. I was just fed up.
>
> I remember stopping, just stopping. Telling her sorry, calm down. As far as I can recall, she went over to the window and she smashed it with her arm. And I asked her why she did that. I said, you know, this is not my apartment, you know. Why did you smash the window? She said that she smashed the window so that the cops could come so they could take me away.
>
> . . .
>
> I think I told her that I can't believe that you—that you're doing this. 'I can't believe that you just want to ruin my life.' And she said, 'Yes, that's what I want to do.' And I remember charging up to her, we started tussling again. I remember she gouged my shoulder with her nails, just digging her nails into my body. And I remember pulling her hair and we worked our way back from the wall to the, you know, back this way

(indicating) and she pushed me to the closet. And I remember falling back into the closet, hitting my head, and from there I basically blacked out. I just went into a rage.

. . .

The next thing I know, she was lying on the floor. I guess I came out of the closet with a pistol and I fell.

. . .

I just remember her calling my name, and she was looking at me. And I didn't see any blood. I didn't see anything. She was just lying on the floor just looking at me. And—and she started— her breathing became labored. And I asked her if she was okay and she just looked at me. And she just said my name again.

And I remember lifting up her shirt and I didn't see any visible wounds, no blood, but her breathing was labored. And I remember tilting her head back so she could breath easier and telling her, asking her what—what happened. What— what's wrong. . . . And she—her breathing was just labored. She couldn't answer. And then I heard the knock at the door. I remember taking a pulse. I really don't think I could feel it.

I remember getting blood on my hands when I took her pulse and I snapped. I just came back to reality. And I heard the knock at the door and I opened up the door. And there was a lady standing there and she asked me if everything was okay. I said, 'No, it's not. Call the police. Call the ambulance. Be sure that the police get here first to secure the scene.' And she asked me again, 'Is everything okay.' I said, 'just call the police and hurry up.'

Muhammad described his mental state immediately after the shooting as "complete shock. I just—the events were unreal, just—there's no other way to say except just complete unrealism. . . ." Asked if he would agree with the police officer's statement that he was calm, Muhammad responded:

No, sir. I can't say that I was displaying flailing hands, because I was thinking about her, I mean, you know. I'm an EMT and I'm trained. In a situation, you got to be calm. She was down on the ground. . . . I really can't take her pulse because I was shaking so much. I couldn't feel it. My heart beat was going so fast. And they train us that never to take a pulse when you're excited because you're going to feel your own heart beat in your fingertips and you may mistake it for the individual's heart beat or the pulse.

And I was in a daze. I have to say in a daze because I was just standing out there. The people were looking at me, I was looking at them. I–I asked them 'Did you guys call the police. Is everything okay? No, everything is not okay.'

The jury was asked to answer a single special issue which crystalized the dispute between the parties as to the nature of this crime:

Do you, the Jury, find by a preponderance of the evidence that the defendant caused the death of NEREIDA FLORES under the immediate influence of sudden passion arising from an adequate cause?

The jury responded "we do not" to this question and assessed the maximum punishment.

■■■ Clearly, Muhammad's calm, apparently unremorseful demeanor was central to the State's punishment case. To explain this, the defense intended for Dr.

Schutte to testify that he had concluded, as the result of his psychological testing, that Muhammad is shy, introverted, does not express emotions openly, is submissive, tends to believe he feels more intensely than others, tends towards a rigid self-view and to have high moral standards, has low self-esteem, a pessimistic view of the future, tends to feel he was placed on this earth to suffer, tends to allow others to take advantage of or mistreat him, and has little hope for the future. We find this evidence was relevant to the jury's determination as to whether Muhammad killed Nereida Flores as the result of a plan, which he did not regret, or whether he killed her during an emotionally charged fight, that he regretted what had happened, but was not able to openly express his sorrow and regret due to his own psychic makeup. Without expert testimony to corroborate his own narrative of events, the credibility of Muhammad's defense was severely diminished.

### Relevance on probation issue

We now turn to the second reason advanced by defendant justifying Dr. Schutte's testimony: that it was relevant on the issue of Muhammad's amenability to community supervision. This topic also went to the very heart of the controversy decided by the jury; the State maintained that Muhammad was a cold-blooded killer, a man with "no regard for human life, absolutely no conscience" who should be punished with the maximum sentence of life in prison. In contrast, the defense urged that Muhammad was a man reacting with violence in a violent situation, that he was remorseful and presented no continuing threat to society, and therefore deserved a lesser punishment, even probation.

■■■ To gauge whether the trial court abused its discretion in excluding the expert's testimony on this subject, we must first examine whether suitability for community supervision is a relevant subject for the jury's consideration in a punishment hearing. Although the law in this area is far from straightforward, after reviewing the history of statute and case law, we conclude this evidence was relevant and admissible.[19]

We begin with *Murphy v. State*,[20] where the Court of Criminal Appeals effectively held that a criminal defendant's suitability for probation is not an issue at the punishment phase at trial, and that evidence tending to show a defendant is suited (or ill-suited) for probation is objectionable as irrelevant.[21] *Murphy* also held, however, that a defendant might open the door to rebuttal evidence on that issue if evidence were presented that the defendant had never been in trouble or could comply with the law if placed on probation.[22] The immediate question in *Murphy* was whether it had been error for the trial court, at punishment, to admit evidence of five prior unadjudicated bad acts as relevant to

19. The State apparently reached the same conclusion, as it does not raise relevancy as grounds for excluding this topic. Alternatively, the State may be tacitly acknowledging it opened the door to this evidence by its cross-examination of Baltazar Perez, Muhammad's pretrial supervision officer. The prosecutor there asked, "have you ever known anyone, who's been convicted of murder, to receive a probated sentence?" The trial court sustained an objection to this question and in-

structed the jury to disregard it, thus slamming the door shut. We therefore decline to rest our analysis on this "open door" rationale.

20. 777 S.W.2d 44, 56 (Tex.Crim.App.1988) (opinion on reh'g).

21. *Murphy*, 777 S.W.2d at 67.

22. *Id.*

"whether or not the defendant is a proper person to have on the street on probation . . . ."[23] This holding was based upon the evidentiary rule, then in force, that neither unadjudicated bad acts, nor the details of adjudicated offenses, could be admitted at the punishment phase of a noncapital prosecution.[24]

At the time *Murphy* was decided, the relevant provision of the Texas Code of Criminal Procedure provided:

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to the prior criminal record of the defendant, his general reputation and his character. The term prior criminal record means a final conviction in a court of record, or a probated or suspended sentence that has occurred prior to trial, or any final conviction material to the offense charged.[25]

In 1989, the legislature amended Article 37.07, to read:

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may, as permitted by the Rules of Evidence, be offered by the state and the defendant as to *any matter the court deems relevant to sentencing, including* the prior criminal record of the defendant, his general reputation and his character.[26]

In *Griffin v. State*, the Court of Criminal Appeals again examined the propriety of evidence concerning suitability for pro-

bation under the pre 1989 version of Article 37.07.[27] There, defendant was charged with sexual assault, and at the guilt-innocence phase of trial, a very similar, unadjudicated sexual assault was admitted for purposes of establishing identity.[28] At punishment, the State resubmitted all evidence from guilt-innocence. The defendant called a dozen witnesses, each of whom " 'pledged' to support appellant and, e.g., 'do everything in his or her power to see to it he lived up to the terms and conditions of probation.' "[29] The State, in closing, argued that probation was "one big, fat joke," and that "not only do we give the first rape, the second rape is free."[30] Reviewing the law on this issue, the Court cited *Murphy*, noting that there,

> [A] plurality of this Court held that Article 37.07 § 3(a) V.A.C.C.P., prohibits admission of specific conduct evidence, over objection, at the punishment phase of trial. Accordingly, extraneous offense evidence admitted at the guilt phase of trial, and expressly limited to use to establish some fact of consequence at that phase, such as identity, motive or intent, will not be accorded some other significance at the punishment phase of trial. Here, appellant's extraneous assault upon the Turners was admitted at the guilt phase as part of the State's proof of identity. Ordinarily, however, the State would be prohibited by Article 37.07, § 3(a), supra, from making further use of that extraneous offense for any purpose at the pun-

---

**23.** *Id.* at 56.

**24.** *Id.* at 57.

**25.** Tex.Code.Crim. Proc. Ann. art. 37.07, § 3(a). Acts 1967, 60th Leg., R.S., ch. 659, § 22, 1967 Tex. Gen. Laws 1739, eff. Aug. 28, 1967.

**26.** Acts 1989, 71st Leg., R.S., ch. 785, § 4.04(a), 1989 Tex. Gen. Laws 3471, 3492, eff. Sept. 1, 1989.

**27.** *Griffin v. State,* 787 S.W.2d 63, 67 (Tex. Crim.App.1990).

**28.** *Id.* at 64.

**29.** *Id.*

**30.** *Id.* at 65.

ishment phase, either evidentiary or rhetorical.[31]

In *Ortiz v. State*,[32] the Court of Criminal Appeals reviewed a case which is the mirror-image of the case here, again under the pre 1989 statute. There, defendant presented her own testimony and that of her family urging that she was a good candidate for probation, and that if the jury recommended probation, she would follow its terms and conditions.[33] The State did not object to this evidence on relevancy grounds, choosing instead to present evidence from a psychiatrist that defendant was "an unsuitable or poor candidate for probation."[34] The Court of Criminal Appeals recognized that under *Murphy*, such evidence was objectionable as irrelevant, but further observed:

> [T]estimony relevant to the trappings of probation *may* be excluded, within the trial court discretion, where it might precipitate a distracting inquiry into the relative merits of probation versus incarceration. This is a far cry from holding that psychiatric testimony focusing on so-called suitability for probation, where that has been made an issue in the punishment phase of the case, will *invariably* be more confusing or prejudicial than probative, *as a matter of law.*[35]

The Court held, however, that the parties had opened the door to consideration of the evidence on punishment by raising suitability of probation. The *Ortiz* Court specifically declined to address whether suitability for probation is an issue under the amended statute.[36]

In *McMillian v. State*,[37] the Court of Criminal Appeals made its only decision in this area using the post–1989 version of Article 37.07. There, the court of appeals had held that evidence of defendant's post-arrest assault on his wife was relevant on the issue of defendant's ability to comply with the terms of probation.[38] The high court reversed, holding "the evidence was introduced prior to any defensive evidence, and was not offered to rebut testimony reflecting appellant's eligibility for probation. Therefore, appellant did not open the door for its admission.... Accordingly, we hold it was error for the trial court to admit it."[39] *McMillian*, although relying on *Murphy*, concerns the special circumstance of unadjudicated extraneous offenses. We therefore decline to infer that other evidence of probation suitability is not admissible without an invitation from the opposing party.

This Court, in *Mock v. State*,[40] specifically addressed the amended Article 37.07, stating that its language allowing admission at punishment "as to any matter the court deems relevant to sentencing,"[41] grants the trial court wide latitude in the admission of evidence deemed relevant as long as its admission is otherwise permit-

---

**31.** *Id.* at 67.

**32.** 834 S.W.2d 343, 346 (Tex.Crim.App.1992).

**33.** *Id.* at 345.

**34.** *Id.*

**35.** *Id.* at 348 (emphasis in original). `

**36.** *Ortiz*, 834 S.W.2d at 346 n. 7.

**37.** 865 S.W.2d 459, 460 (Tex.Crim.App.1993).

**38.** *McMillian v. State*, 850 S.W.2d 777, 781 (Tex.App.—Houston [14th Dist.] ), *rev'd*, 865 S.W.2d 459 (Tex.Crim.App.1993).

**39.** *McMillian*, 865 S.W.2d at 460 (citing *Murphy*, 777 S.W.2d 44 and *Grunsfeld v. State*, 843 S.W.2d 521, 526 n. 12 (Tex.Crim.App. 1992)).

**40.** 848 S.W.2d 215, 225 (Tex.App.—El Paso 1992, pet. ref'd).

**41.** TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (Vernon Supp .2001).

ted by the rules of evidence. Consequently, the *Mock* trial court committed no error in admitting testimony by defendant's Florida probation officer that defendant's continuous violations of law, coupled with past ineffective attempts to rehabilitate him, indicated there was no chance of rehabilitation.[42] *Mock* overruled this Court's earlier decision in *Parra Gonzales v. State*,[43] which held irrelevant and inadmissable expert evidence on the adequacy of local probation programs to handle defendant, that defendant would not pose a continuing threat to society, and that defendant was worthy of probation.[44]

Recently in *Peters v. State*,[45] our sister court, citing *Mock,* has agreed that suitability for probation can be relevant to the jury's recommendation, even where the opposing party has not first opened the door to such evidence, provided it is helpful to the jury in determining the appropriate sentence.[46] After extensive thoughtful discussion, the *Peters* court reversed for a new punishment hearing where the trial court had excluded expert psychiatric testimony on recidivism rates for persons guilty of incest.[47]

Conversely, in *Hardin v. State*,[48] the Texarkana Court of Appeals cited *Ortiz* and *Griffin* for the contention that a defendant's suitability for probation or his ability to abide by the terms and conditions of probation are not issues in the punishment phase of trial. Thus, that court held "any evidence that a defendant propounds to show his suitability for probation is objectionable. However, if the defendant opens the door by offering such evidence, the State may choose to forego an objection and offer rebuttal evidence instead."[49] *Hardin* contains no discussion of the amended Article 37.07.

Finally, and importantly in this case, we note that, although unexamined in any of the cases we have discussed, in 1989 the legislature added additional language to Article 37.07 expanding the scope of relevant punishment evidence:

> A court may consider as a factor in mitigating punishment the conduct of a defendant while participating in a program under Chapter 17 of this code as a condition of release on bail.[50]

Although we have found no cases discussing this section's evidentiary impact, we think it self-evident that the conduct of a defendant while free on bail is certainly relevant to the amenability of that same defendant to community supervision.

■ We find it clear that the legislature intends the widest sweep of relevant evidence to be considered by the jury in determining punishment. We can see no logical reason for excluding evidence on suitability for probation from that deliberation, and therefore hold there was no legal obstacle to the admission of Dr. Schutte's evidence on Muhammad's suitability for probation. We consequently pro-

---

42. *Mock,* 848 S.W.2d at 224.

43. 756 S.W.2d 413, 417 (Tex.App.—El Paso 1988, pet. ref'd).

44. *Id.* at 416–17.

45. 31 S.W.3d 704, 719 (Tex.App.—Houston [1st Dist.] 2000, pet. filed).

46. *Id.* at 722.

47. *Id.* at 723.

48. 20 S.W.3d 84, 90 (Tex.App.—Texarkana 2000, pet. ref'd).

49. *Id.* (citations omitted).

50. Act of June 15, 1989, 71st Leg., R.S., ch. 785, § 4.04, 1989 Tex. Gen. Laws 3471, 3492, *amended by* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 5.05, 1993 Tex. Gen. Laws 3586, 3759 (changing "Article 17.40 or 17.42(a)" to "Chapter 17").

ceed to examine the content of that testimony under the *Nenno* relevance criteria.

Dr. Schutte testified outside the jury's presence that Muhammad was not a psychopath, would be a good candidate for rehabilitation, had an "extremely low risk for reoffending," would have little or no difficulty with discipline, showed no signs of an antisocial personality, tends to be submissive, and has high moral standards. Based upon this, Schutte opined that Muhammad is not someone at risk to violate the law in the future. At a bond hearing held before trial on the merits, Schutte testified similarly, that Muhammad was at low risk for committing future acts of violence, and that he was "a very good candidate for releasing to the community. He does not possess any other characteristics which are known and found to be associated with violent recidivism ... [has no] psychotic symptoms or psychotic disorders which might pose a risk to the community." Within a reasonable psychological certainty, the tests he administered are a reliable means of predicting behavior, but of course they are not absolute.

We find this evidence was relevant on the issue of punishment, specifically whether Muhammad was a suitable candidate for probation. Having found that Dr. Schutte's testimony was relevant to the jury's task of setting punishment on both theories advanced by defendant, we therefore turn to the second *Kelly* inquiry, reliability of the psychological evidence.

### Reliability of Dr. Schutte's testimony

▇▇▇ Psychological evidence falls within the ambit of "soft" science, and we review the trial court's decision as to its reliability by examining whether: (1) the field of expertise involved is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field.[51] Although study of the human psyche is, and no doubt always will be, a matter for refinement and debate, it is certainly a legitimate field of expertise subject to well-recognized norms and standards. Dr. Schutte's testimony, an analysis of three common and well-recognized standardized psychological tests he administered to defendant, was clearly within the scope of that field. Dr. Schutte's testimony, as we read Muhammad's bill of exceptions, simply consisted of reporting on the results of his testing and delivering to the fact finder his professional interpretation of those results. We must conclude that Dr. Schutte's testimony, on the issue of Muhammad's demeanor as it reflected his emotional state at the time of the killing, properly relied upon established psychological principles. The testimony was not excludable on any of the grounds established by the Court of Criminal Appeals in *Nenno.*

In further examining the reliability of expert testimony, we may look at a number of other factors (but here we must bear in mind that the factors were formulated for evaluation of "hard" scientific evidence, and are not necessarily applicable). These are: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory or technique; (4) the potential rate of error; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying theory and technique can be explained to the court; and (7) the experience and skill of the person who

---

51. *Nenno,* 970 S.W.2d at 561.

actually applied the technique.[52] We will examine these factors next.

### Acceptance as valid within scientific community

 The Minnesota Multiphasic Personality Inventory was developed in the 1930's as a diagnostic tool in the examination and treatment of psychological pathology.[53] It was refined in 1989 to remove certain "offensive" questions and eliminate sexist language;[54] the test's current version is designated the MMPI II. It is an objective test; that is, it requires that the same questions be asked in the same order every time it is administered.[55] The MMPI II is a protected test, which means it cannot be purchased by anyone save licensed practitioners, and those persons are prohibited from disclosing any information which could invalidate test results.[56] It is easy to administer, and unlike many other psychological tests, can even be administered by a layperson in many circumstances.[57] It is the most widely used personality inventory and has been the subject of empirical research and refinement throughout its years of existence.[58] It is designed with internal validity scales to discern attempts by the test taker to deceive.[59]

The Millon Clinical Multiaxial Inventory (MCMI) is a second objective personality inventory modeled after the MMPI and developed in the 1960's.[60] It consists of 175 true-false questions and is designed to provide differentiation among groups of adults in significant emotional or psychological distress.[61]

The Psychopathy Checklist–Revised, according to Dr. Schutte's testimony, is the best known predictor of violent recidivism, and measures to what degree a person fits the profile of a psychopath, one who is lacking in empathy, callous, antisocial, and violent.

All three of the tests administered by Dr. Schutte are well recognized as valid within the psychological community. What is more, they are frequently employed as tools in the courtroom where issues of psychological status must be decided.[62] Each test has a known potential rate of error. This factor weighs in favor of reliability and admissibility of the testimony.

### Qualifications

 Dr. Schutte has a doctorate in forensic psychology and at the time of trial had been in practice for two and a half

52. *Kelly*, 824 S.W.2d 568, 573.

53. *See* McClure, D., *Psychological Testing*, State Bar of Texas Advanced Family Law Course (1997) page HH–11.

54. *Id.* at HH–16.

55. *Id.* at HH–21.

56. *Id.* at HH–12.

57. *Id.* at HH–21.

58. *Id.*

59. *Id.*

60. *Id.* at HH–24.

61. *Id.*

62. *See, e.g., Wolfe v. State*, 917 S.W.2d 270, 281 (Tex.Crim.App.1996) (MMPI II); *S.V. v. R.V.*, 933 S.W.2d 1, 12 (Tex.1996) (MMPI); *Smetana v. State*, 991 S.W.2d 42, 46 (Tex. App.—Tyler 1998, no pet.) (psychopathy checklist-revised and MMPI); *Hernandez v. State*, 885 S.W.2d 597, 599–600 (Tex.App.—El Paso 1994, no pet.) (MMPI); *Garza v. State*, 878 S.W.2d 213, 218 (Tex.App.—Corpus Christi 1994, pet. ref'd) (MMPI); *In the Interest of A.V.*, 849 S.W.2d 393, 395 (Tex.App.—Fort Worth 1993, no pet.) (MMPI and MCMI); *Nolte v. State*, 854 S.W.2d 304, 310 (Tex.App.—Austin 1993, pet. ref'd) (MMPI); *Johnson v. King*, 821 S.W.2d 425, 427 (Tex. App.—Fort Worth 1991, pet. denied) (MMPI).

years. He personally administered and evaluated the tests in question. He has written and published articles about the tests. The State contends that because Dr. Schutte is a forensic rather than a clinical psychologist, and because he was unfamiliar with articles in a psychological journal critical of the tests, that he was unqualified to testify as an expert. We disagree. That he could not discuss the content of two published articles when examined about them without preparation might damage his testimony in the fact finder's eyes, but we do not think it disqualified him as an expert.

As we have noted, Schutte's opinion testimony concerned objective tests that do not require great expertise to administer. By the State's own admission, Dr. Schutte is a professional with expertise in the area of competency, insanity, and future dangerousness of persons accused of crime. We find this an area quite pertinent to his testimony.

Moreover, we note that Dr. Schutte had testified without objection at a bond hearing before the same trial court in this very case about his administration and analysis of these same tests to the same defendant. He has testified in at least ten other criminal cases, including another before this trial court and judge only a few weeks before trial here. We conclude that Dr. Schutte had ample qualifications as a expert, and any flaws in his background were more appropriately fodder for cross-examination rather than total exclusion of his testimony. This factor weighs in favor of reliability and admissibility.

### Literature regarding the scientific theory

In arguing that defendant did not meet this factor, the State relies upon two articles (neither of which are included in this record) apparently discussing fake-good and fake-bad responses to objective tests including the MMPI II. This Court is confident that, although critique of these tests is ongoing within the psychological community, nevertheless they are well established as reliable techniques for assessing personality. We may take judicial notice of that reliability.[63] That they are subject to refinement and examination should again be a subject for cross-examination, not exclusion.

### Potential rate of error

Dr. Schutte discussed the potential rate of error for each test, which appears to be well established and accepted. The tests contain internal scales for assessing attempts at falsification.[64] They have been revised to correct early cultural or gender bias.[65] We do not find any rate of error exposed here which might properly cause the exclusion of evidence on these tests.

### Availability of other experts

As just discussed, these tests are the subject of extensive testing and analysis within the psychological community.

### Clarity with which theory may be explained to court

We are confident that the trial judge here, as a district judge of many years experience, is well acquainted with

**63.** *Weatherred,* 15 S.W.3d at 542; *Epps,* 24 S.W.3d at 879.

**64.** McClure, D., *Psychological Testing* at HH–13.

**65.** For example, the original MMPI used norms constructed from samples taken from the population of Minnesota. The MMPI II used sample groups from across the U.S., including more diverse socio-economic and cultural groups. McClure, D., *Psychological Testing* at HH–15.

these psychological tests. Dr. Schutte's testimony at Muhammad's bond hearing and in the bill of exceptions set out the purpose and nature of these tests in an understandable way. These are tests commonly encountered in many types of litigation. This factor did not support exclusion of the testimony.

### Experience and skill of person applying technique

For the reasons discussed under qualifications, we believe Dr. Schutte met the gatekeeper requirements for experience and skill in administering, analyzing, and explaining these tests to the jury.

■ We therefore conclude that the testimony proffered by Muhammad through his psychological expert, James Schutte, met both the relevance and reliability requirements of *Kelly* and *Nenno*. The State's criticisms of this evidence should have impacted the weight given the testimony, not its admissibility. If this evidence could be properly excluded, we fear there is little psychological evidence that the trial court could not exclude at whim, without fear of reversal. We do not think the broad discretion granted the trial court in its *Kelly* gatekeeper role extends so far. Accordingly, we reach the issue of harm.

### Harm

■ Tex.R.App. P. 44.2 sets out the standard for this Court in determining whether error warrants reversal in criminal cases. Although we can certainly conceive of situations where exclusion of evidence might impact constitutional rights,

generally error in the admission or exclusion of evidence does not rise to the constitutional level.[66] We therefore assay harm here under Rule 44.2(b), "any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." [67] A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[68] We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect.[69]

■ Here, the facts of the shooting and the guilt of the defendant were undisputed. The sole issue before the jury was whether Muhammad acted out of sudden passion arising from an adequate cause, or whether he had committed a premeditated murder for which he displayed no remorse. He testified on his own behalf that he had acted in a "blackout" in response to Nereida Flores's rage. The State, however, had witnesses that characterized Muhammad as calm, unemotional, and lacking remorse immediately following the shooting and through the months following. The defense case, to a large extent, consisted of two elements: Muhammad's testimony, and his expert's corroborating evidence that he was a naturally introverted person without the ability to display his emotions. We find the psychological evidence was essential to establishing Muhammad's credibility with the jury. Without it, the jurors could consider only his own explanation of how the killing occurred, which they could have easily disregarded as self-

**66.** *See Fowler v. State,* 958 S.W.2d 853, 865 (Tex.App.—Waco 1997), *aff'd,* 991 S.W.2d 258 (Tex.Crim.App.1999).

**67.** Tex.R.App. P. 44.2(b).

**68.** *Peters,* 31 S.W.3d at 722.

**69.** *Id.*

serving. Moreover, although the jury may not have long deliberated on giving probation in a murder case, they were legally required to consider it. Dr. Schutte's testimony that Muhammad was not a continuing threat to the public, and that he could abide by the terms of probation if it was given, were relevant to punishment and should have been available to the jury in assessing punishment. That the jury ultimately assessed the maximum sentence does not alter our conclusion here; it is certainly possible that Schutte's evidence on community supervision would have resulted in a shorter sentence, if not a probated one.

Thus, both topics for which the expert testimony was offered were pivotal issues in this punishment case. Excluding Dr. Schutte's testimony hindered Muhammad's ability to rebut the State's case that Nereida Flores's shooting was premeditated, and that Muhammad was a cold, calculating killer. We must conclude that exclusion of the psychological evidence deprived Muhammad of a substantial right, and that reversal is warranted.

## *CONCLUSION*

If this Court were to affirm the trial court's exclusion of Dr. Schutte's testimony, we would be creating precedent that: (1) a licensed psychologist with a doctoral degree, with over two years experience in forensic psychology, who had testified on the same subject matter in the same case before the same trial judge, was not a qualified expert on the topic of psychological testing; or (2) that the MMPI II, the MCMI and the Psychopathy Checklist–Re-

vised are not reliable methods in the field of psychological testing. We are wary of the consequences such holdings might bring. This Court, through this author, has characterized the MMPI as "a traditional diagnostic test recognized by the psychology profession." [70] That these testing methods are subject to criticism, revision, and improvement, in our opinion, does not diminish their value; rather, this is simply recognition that the human psyche is not subject to mathematical measure, and that our understanding of how the brain and emotions work is constantly evolving. We find the State's criticisms of Dr. Schutte's qualifications, his conclusions, and the methods he used to test Muhammad did not discredit his testimony to the extent that the trial court was justified in relegating it to the "junk science" dustbin. Rather, these matters should have been explored on cross-examination, as affecting the weight to be given the psychological evidence, not its admissibility.

Finally, we wish to note that the original intent of *Daubert, Kelly, Nenno* and their many progeny was to *expand* the use of scientific and technical information available to the fact finder, by relaxing the traditional barriers to opinion testimony.[71] Although the trial court has a solemn duty to prevent unreliable, untested, or unverifiable evidence from reaching the jury, that court also has a duty to allow the fact finder to sort through evidence which may assist in reaching a just result. We must conclude that the trial court acted arbitrarily in excluding the defense psychologist from testifying here, without reference to guiding principles. Appellant's Issues

**70.** *America West Airlines, Inc. v. Tope,* 935 S.W.2d 908, 917 (Tex.App.—El Paso 1996, no pet.).

**71.** *Nenno,* 970 S.W.2d at 561 (quoting *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469, 480 (1993)).

One and Four are sustained.[72] The case is remanded for a new punishment trial.

---

**72.** We need not reach Issues Two, Three, Five, and Six, as those urge constitutional error and we have found harmful error under the non-constitutional standard of review.