

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00200-CV

IN THE INTEREST OF S.W., K.H.,
K.H., K.H., K.H., AND K.V.,
CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

T.H. (Mother) appeals the trial court's order, incorporating a jury's verdict, that the Texas Department of Family and Protective Services (Department) be named permanent managing conservator of her children, K.H., K.H., K.H., K.H., and K.V. and that her child S.W.'s father be named his sole managing conservator. K.V.'s father Q.D. (Father) appeals the same order as to K.V. only. We affirm.

---
[1]*See* Tex. R. App. P. 47.4.

**Background**

Mother has a history of bipolar disorder since she was a teenager. She is from Michigan and while living there was involved numerous times with that state's Department of Human Services (DHS). Five of the six children, who were between nine and fifteen years old at the time of trial, had been removed from her in Michigan at least twice, the latest in early 2009. The youngest child, who was two years old at the time of trial, had also been removed in Michigan in 2009. In that case, the trial court dismissed a termination suit because Mother had addressed the factors that caused the removal. After that case was closed, Mother moved to Texas.

In November 2009, the Department received a referral about the children but did not remove them at that time. After receiving phone calls from two of the children in December 2009, the Department removed the children based on allegations of neglect and possible physical abuse due to Mother's psychological issues.

The Department filed a suit for conservatorship and, alternatively, termination. The trial court extended the dismissal deadline in this case once. By the time of trial, the Department was no longer seeking termination of the rights of Mother or of the children's fathers.[2] A jury found that the Department should be the permanent managing conservator of K.H., K.H., K.H., K.H., and

---

[2]K.H., K.H., K.H., and K.H. have the same father; he did not appeal from the trial court's order naming him a possessory conservator.

K.V. and that S.W.'s father should be his managing conservator. The trial court's order names Mother possessory conservator of all six children and provides that she have two-hour supervised visitation with five of them every other week; because S.W.'s father was named his managing conservator, the trial court ordered that reasonable visitation with Mother be established by agreement if possible. The order also names Father possessory conservator of K.V. and provides that he have two-hour supervised visitation with her every other week.

## Father's Appeal

Father raises a single issue in his appeal, which he also included in a statement of points. Father contends that the trial court erred by admitting Exhibit 18, a copy of a home study request and results on Father's home in Michigan. Father objected to the exhibit because "there was nothing supporting the trustworthiness of the Michigan home study and there was a great deal about the Michigan home study that brought its trustworthiness into question."

At trial, the Department sought to introduce the exhibit through CPS conservatorship worker Gale Davis, who had been assigned the case in January 2010. Father's counsel objected that the document contained hearsay and that he could not cross-examine anyone regarding the contents of the document. The trial court initially sustained the objection.

Later, Davis testified on redirect that she was the custodian of CPS files for this case, that the files are records kept in the ordinary course of business, that she had general knowledge of the files, and that she had incorporated

3

documents into the file as she received them. On voir dire, she testified that exhibit 18 was a packet of documents responsive to her request through the Interstate Compact on the Placement of Children to conduct a home study on Father. She complied with the rules on submitting such a request. The Interstate Compact Placement Request form has two signatures: one from a Texas official and one from a Michigan official. Davis's supervisor, Bose Oludipe, reviewed the document upon receipt, as evidenced by her signature on the request form.

Davis testified that in determining the reliability of the memorandum from Michigan DHS attached to the request, she relied on the fact that it was done in compliance with the Interstate Compact. The Department offered the records under the hearsay exceptions set forth in rules 803(6) and (8) of the rules of evidence, the business records and public records exceptions, respectively. Tex. R. Evid. 803(6), (8). The trial court admitted the exhibit over Father's well-developed hearsay, foundational, and Confrontation Clause objections.

Exhibit 18 contains a cover page from the Department's Interstate Compact Office with a box checked next to each of the following: (1) "ICPC 100A: . . . Denial" and (2) "Interstate services appear complete. Our Interstate case is closed[.]" It is addressed to the attention of Dale Murray. At the bottom is a handwritten note: "Denied. B. Oludipe CVS Supervisor II 3/14/11." The next page is on Michigan Department of Human Services letterhead and has the same boxes checked, plus a box for "Home Evaluation." The next page is a form

4

entitled, "Interstate Compact Replacement Request" to Genesee County Michigan from the Department. Under the "Services Requested" box, "Parent Home Study" is checked, and under the box "Placement Information" box, Father is listed. Signatures are included in two sections, "Signature of Sending State Compact Administrator or Alternate" and "Signature of Receiving State Compact Administrator or Alternate." Under "Action by Receiving State," the box "Placement Shall Not Be Made" is checked. A lab report showing DNA test results of Father's paternity of K.V. is included. And finally, the exhibit contains a memo to Dale Murray, Interstate Compact, from Cheryl Henry, Foster Care Manager, by Amanda Kulaszewski, Foster Care Specialist, stating that when Michigan DHS contacted Father, he disclosed that he had a felony conviction in 1982 and that he lived with another man, about whom he would not provide the information necessary to run background checks. The memo also states that a "LIEN and Central Registry" check was performed on Father, revealing the following:

- "a current PPO against him not expiring until March 2011";

- in 1981, he was charged with two counts of "1100 sexual assault"[3] and two counts of "1000 kidnapping" and received a ten to fifteen year sentence;

- also in 1981, he was charged with one count of "2300 Larceny";

---

[3]It is unclear from the record what these numbers refer to, but in context, they appear to be Michigan code references.

●    in November 2008, he was charged with one count of misdemeanor larceny;

●    in September 2010, he was charged with one count of "1300 ordinance violation assault excluding sexual" and was convicted of "Ordinance Violation Stalking"; and

●    he is on the Central Registry "for hitting his minor daughter . . . on November 14, 2006, in the head and breaking her blood vessels in her eye while she was pregnant."

Based on the above, the memo concludes, "At this time Genesee County DHS does not feel it would be appropriate to proceed with a home study given [Father's] criminal and central registry history.  We are at this time denying the request."

Father's primary argument against admissibility of the exhibit is that nothing in it shows how Michigan prepared its response to the Department's request, and Davis did not testify that she had personal knowledge of how Michigan prepared its response.  Specifically, Father argues that nothing shows how Michigan identified Father as the person with the criminal history mentioned in the memo or whether it ruled out other men with the same name.[4]

---

[4]The Department contends on appeal that Father did not preserve this argument by focusing solely on the business records, and not the public records, exception.  However, Father does argue that there is no foundation for the trustworthiness of the documents, which is a consideration under both exceptions.  *See* Tex. R. Evid. 803(6), (8); *Tex. Dep't of Pub. Safety v. Caruana*, 363 S.W.3d 558, 564 (Tex. 2012); *Dodeka, L.L.C. v. Campos*, No. 04-11-00339-

6

Documents are admissible under rule 803(8) if they are (1) "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies setting forth . . . matters observed pursuant to duty imposed by law as to which matters there was a duty to report" or (2) "factual findings resulting from an investigation made pursuant to authority granted by law . . . unless the sources of information or other circumstances indicate lack of trustworthiness." Tex. R. Evid. 803(8).  Rule 803(8) creates a presumption of admissibility; it is the burden of the party opposing admission to show that a document proffered under this hearsay exception is untrustworthy.  *1001 McKinney, Ltd. v. Credit Suisse First Boston Mtg. Capital*, 192 S.W.3d 20, 28 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

Texas law provides that before placing a child with a relative, the Department must conduct an investigation to determine whether the proposed placement is in the child's best interest.  Tex. Fam. Code Ann. § 264.754 (West 2008).  In obtaining a home study on an out-of-state relative, the Department must comply with the Interstate Compact on the Placement of Children (ICPC), which requires the other state's authorities to inform the Department in writing "that the proposed placement does not appear to be contrary to the interests of the child" before the Department may send or bring a child, or cause a child to be

---

CV, 2012 WL 1522179, at *4 (Tex. App.—San Antonio May 2, 2012, no pet.) (op. on reh'g).  Thus, we address his argument.  *See* Tex. R. App. P. 38.1(f); *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008).

7

sent or brought, to that state. *Id.* § 162.102, art. III, sec. (d) (West 2008). Thus, for the Department to even consider here whether K.V. could be placed with Father, it was required to make a request to Michigan under the ICPC and obtain assurance from Michigan that such a placement would not be contrary to K.V.'s best interest. *See id.* Accordingly, we conclude and hold that exhibit 18 contains findings pursuant to an investigation taken according to law. *See* Tex. R. Evid. 803(8); *Tex. Dep't of Public Safety v. Caruana*, 363 S.W.3d 558, 564 (Tex. 2012).

Father nevertheless contends that the documents in the exhibit show indicia of untrustworthiness. Davis testified that she knew the persons named in the "from" part of the Michigan DHS memo and that she had talked to at least one about other cases. She also testified that she "rel[ied] on the receiving state, that their staff and their department [was] doing due diligence in ascertaining all the information [that was] necessary and needed for [her] to review in order to determine whether placement [was] appropriate." Indeed, the ICPC states that the purpose and policy of the cooperating states is to, among other things, give "[t]he appropriate authorities in a state where a child is to be placed [the] full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child" and to give "[t]he proper authorities of the state from which the placement is made . . . the most complete information on the basis on which to evaluate a

projected placement before it is made." Tex. Fam. Code Ann. § 162.102, art. I, secs. (b), (c).

The memo attached to the request forms states that direct contact was made with Father, does not indicate that the person contacted denied knowing the purpose of the call, and indicates that the person voluntarily admitted to a criminal history that included a felony. Given that in the direct conversation, the person contacted by Michigan DHS refused to give information about his roommate to enable DHS to make any further inquiries, DHS's reluctance to recommend a placement according to the ICPC does not show problems with its methodology. *Cf. Saavedra v. Schmidt*, 96 S.W.3d 533, 539 (Tex. App.—Austin 2002, no pet.) (noting that caseworker described California home study as the worst she had ever seen because all of the information in it came from the proposed placement himself). Accordingly, we conclude and hold that the trial court did not abuse its discretion by admitting Exhibit 18 under the public records exception contained in rule 803(8). *See Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1306–08 (5th Cir. 1991) (explaining that, under almost identical federal rule, general distrust of out-of-court declarants underpinning hearsay rules does not apply to government officials preparing official documents unless proven otherwise); *Beavers ex rel. Beavers v. Northrup Worldwide Aircraft Servs., Inc.*, 821 S.W.2d 669, 675 (Tex. App.—Amarillo 1991, writ denied). We overrule Father's sole issue.

9

**Mother's Appeal**

In a single issue, Mother contends that her trial counsel was ineffective.

**Standard of Review**

To establish ineffective assistance of counsel, the appellant must show by a preponderance of the evidence that her counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009); *see also In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003) (adopting *Strickland* standard for evaluating counsel's performance in child protection cases).

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance

claim. *Salinas*, 163 S.W.3d at 740; *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Id.* at 697, 104 S. Ct. at 2070.

**Analysis**

Mother points to several ways in which her trial counsel was ineffective.

11

**Opening Statement**

Mother complains about the way trial counsel portrayed her in counsel's opening statement, in which she stated, among other things,

> Now, let me tell you about her as a person. She's eccentric. She's not slow to raise her voice at me. I'm her attorney and she tells me where to step off constantly. She has passion, she has opinions. If she thinks she's being slighted or that her children are not getting what her children deserve, I promise you, she's got a short fuse, okay? I'm not saying that doesn't mean she can't raise her kids. I know there are worse problems.

Counsel also stated,

> She's very aggressive about her children going to school. She's probably irritated a half-dozen counselors and Special Ed teachers half to death because she wants more services for her kids that are having trouble keeping up. She has a couple of really bright kids and a couple that struggle, and she wants help for the ones that struggle to help them catch up.

Finally, counsel told the jury,

> So in front of you this week, you're going to see a woman who is -- who's a little bit mentally unhealthy sometimes, okay? So she's not the strongest person in the room, and she's going to have to sit here and listen to a string of people brought in to talk trash about her, because some of it's true. Sometimes she yells, she acts the fool, she plays her radio loud. If she doesn't want something in the house, she throws it out. Crazy. We're talking about people. We're talking about a person. And you know what? She has some personality traits that make her frustrating to work with. I'm surprised she hasn't gone through two dozen CPS caseworkers. She's practically tormented me to death, but that doesn't mean she's a bad mother. It means that she wants to push me to do a better job. She wants her kids in her home. She wants them in their church, she wants them in their schools, she wants them in their beds.

Counsel's entire statement, read in context, shows an attempt to mitigate the effect on the jury of the Department's evidence of Mother's history of erratic

12

behavior related to her mental illness; counsel reinforced many times that Mother was a good and loving parent despite her seemingly aggressive and odd behaviors. The theme of counsel's opening statement, taken in context, is that although Mother's behavior was sometimes bizarre and offputting to others, it was motivated by good intent and a desire to do what was best for her children. At one point, counsel called Mother's care of her seriously ill daughter "impressive."

During the motion for new trial hearing, counsel testified that Mother herself had provided counsel with documentation of her mental illness and that the strategy she intended to use at trial was to argue that the Department's actions were premature and that everyone acknowledged that Mother had been "quite stable" in the months before trial.

Accordingly, we conclude and hold that Mother has failed to show that counsel's opening statement was not motivated by sound trial strategy. *Cf. Bahr v. State*, 295 S.W.3d 701, 713 (Tex. App.—Amarillo 2008, pet. ref'd) (holding that when defendant will testify in criminal case, defense strategy of bringing out defendant's bad history to make him or her more believable is reasonable); *Jagaroo v. State*, 180 S.W.3d 793, 800 (Tex. App.—Houston [14th Dist.] 2005, pets. ref'd) (concluding that counsel's closing statement, as a whole, advanced defendant's interests).

### Evidence of Mother's Firing Attorneys

Mother contends that counsel's failure to file a motion in limine to prevent the jury from learning of her history of firing attorneys, failure to object to questioning about her firing of attorneys, and failure to move for mistrial on that

basis is "conclusive[ly] indicative of trial counsel's abandonment of her client, and *prima facie* evidence of her ineffective representation."

According to Mother, "[t]he deliberate efforts by the State to impugn [Mother] and essentially demonize her by demonstrating specific instances of her bad behavior toward her own lawyers were met without resistance, prior to and during the trial."  Specifically, she complains about the following exchanges during the Department's direct examination of Davis:

> Q Would it be fair to say that [Mother] has not just had difficulty working with you, but also with other providers?
>
> A Yes.
>
> Q Is she on her 5th attorney?
>
> A She is.
>
> Q And has she routinely complained to the courts and to anyone else who would listen that no one has given her a fair shake and everybody is mistreating her and she can't trust anyone and everyone is double-crossing her? Has that been her routine complaint about the attorneys that represented her and the providers and the Department?
>
> A She considers this a false case against her.
>
> . . . .
>
> Q And she's also filed grievances against the attorneys in this case; is that correct?
>
> A That's my understanding.
>
> Q She's filed grievances -- we won't call any names, but she's probably filed some three or four grievances against attorneys who have and have not represented her during the pendency of this case.

14

A That's true.

. . . .

Q Hasn't she still filed documents with the Court that she wasn't supposed to file?

A Yes, she has.

Q And she wanted to fire her lawyer just a couple of weeks ago, isn't that correct?

A That's correct.

. . . .

Q Now, over the course of that time between December 26th -- well, just so we're clear, on December 28th, 2009, the Department actually came into court and got an emergency order signed, is that correct?

A That's correct.

Q And an attorney was appointed to represent [Mother].

A Yes.

Q All right. Now, between that December 28th, 2009 date and March 25th where we actually had a show cause hearing, were there multiple settings of the actual show cause that didn't go forward?

A Yes, there were.

Q And during that three-month period of time, did [Mother] fire not just one but two attorneys?

A That's correct.

Q So did that contribute to the delay in actually having a contested show cause hearing?

A Yes, it did.

15

. . . .

Q Also, back around September of 2010, did [Mother] put before the Court a motion to have the ad litem booted off the case?

A Yes.

Q And was that declined?

A Yes.

Q All right. Did she also ask the Court to fire her fourth attorney?

A Yes.

Q And was that declined?

A Yes.

Mother contends that by failing to object to these questions, her trial counsel allowed the State to improperly comment on the attorney-client relationship. However, this evidence is relevant to the State's allegations that Mother had a pattern of alternating between periods when she was stable and had her illness under control followed by relapses in which she exhibited erratic behavior leading to confrontations with other people, including her caseworker, therapist, and people at a homeless shelter.[5] Mother does not argue on what

---

[5]One of her counselors included the following in one of his reports:

[Mother] lacks insight into how her problematic behaviors impact others and tends to externalize. [She] indicated, "I suffer most from people treating me wrong." [Mother] perceives herself as having less negative characteristics than most others. [Mother] reported, "I always tell the truth." . . .

basis the trial court would have excluded such evidence, and considering other evidence of Mother's behavior during this case, it is not substantially more prejudicial than probative. *See* Tex. R. Evid. 403; *Davis v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00314-CV, 2012 WL 512674, at *2–4 (Tex. App.— Austin Feb. 15, 2012, no pet.) (mem. op.). Moreover, it is apparent that counsel's trial strategy was to concede Mother's often extreme behavior while trying to show that even such extreme behavior did not affect her ability to parent her children. For example, on cross-examination, she elicited from Davis that Mother is a highly concerned parent and aggressive advocate for her children, that Davis would rather deal with a concerned parent than a disinterested one, that Mother wants her children to be successful, and that Mother had continually asked for more time and unsupervised visits with them.[6] The fact that counsel undertook such a strategy at Mother's insistence does not render counsel's performance ineffective. *See McFarland v. State*, 845 S.W.2d 824, 848 (Tex. Crim. App. 1992) ("When a defendant preempts his attorney's strategy by

. . . .

[Mother's] profile suggests someone who tends to minimize emotional difficulties, which will be a barrier to the rehabilitative process. [Mother] has a history of receiving treatment services, yet her problematic issues appear cyclical in nature with strong consequences at times. [Mother] lacks insight into the underlying motivations and behaviors of her life difficulties.

[6]She also elicited testimony from a different witness, Mother's father, that when Mother's illness is not bad enough to send her to the hospital she is a "good enough" mother to raise her children.

17

insisting that a different defense be followed or by insisting that certain evidence be put on or kept out, no claim of ineffectiveness can be sustained."), *cert. denied*, 508 U.S. 963 (1993), *overruled in part on other grounds by Bingham v. State*, 915 S.W.2d 9, 14 (Tex. Crim. App. 1994). Accordingly, we conclude that counsel was not ineffective for failing to object to evidence about Mother's firing of her previous four attorneys.

**Lack of Preparation**

Mother contends, as evidenced by her trial counsel's testimony at a motion for new trial, that counsel was unsure about how to deal with her role in the case, was stressed out by Mother, and showed a lack of preparation by failing to file reasonable motions, filing unnecessary motions, and failing to subpoena one of Mother's counselors, Dr. Habbu, and medical records pertinent to his testimony. Mother does not argue how she was prejudiced (or the outcome of the trial affected in any way) by this alleged lack of preparation other than to say that if Dr. Habbu's testimony "was possibl[y] harmful to [Mother], then [counsel's] decision to subpoena him makes no sense either."

At the motion for new trial hearing, Mother's trial counsel testified that she was appointed six months before trial, that she had been present for Dr. Habbu's testimony at a temporary hearing in October 2010, and that she had repeatedly spoken to him and his staff in March and April 2011. She purposefully did not subpoena Dr. Habbu's records because she learned that some of the MHMR

18

matters "would be damaging" to Mother. And she stated for the record at trial that she had advised Mother against calling Dr. Habbu as a witness.

Counsel testified at the motion for new trial hearing that her client insisted that she serve numerous unnecessary subpoenas. Counsel also testified that Mother had her "running 20 different directions at all times," that Mother had tried to fire her repeatedly, and that Mother was quite insistent about making counsel file what she wanted and preventing counsel from filing what she did not want filed; Mother had complained about other attorneys filing motions she did not want filed. Counsel refused to file motions that were beyond the scope of her representation, however.

Nevertheless, counsel was able to successfully keep out some of Dr. Habbu's records concerning Mother, which she had determined would be damaging. Counsel was able to elicit from Dr. Habbu that Mother was stable, was not a danger to herself or others, and that she was taking her medications. The most damaging testimony elicited from him on cross-examination was that he had only recently seen Mother twice for around fifteen to twenty minute sessions.

Accordingly, we conclude and hold that counsel was not ineffective in this regard. *See McFarland*, 845 S.W.2d at 848; *In re C.E.C.*, No. 02-06-00065-CV, 2006 WL 3627134, at *2 (Tex. App.—Fort Worth Dec. 14, 2006, no pet.) (mem. op.).

19

**Failure to Obtain More Recent Mental Health Evaluation**

Mother also contends that counsel should have obtained an updated mental health evaluation closer to trial rather than relying on the one from summer 2010, and as a result, Mother's trial counsel unreasonably relied on the fact that the State had acknowledged "quite clear[ly]" that Mother was doing well after being hospitalized in December 2010. Mother claims that this shows counsel merely acquiesced in the State's theory of the case.

Mother does not say what a new psychological evaluation would have shown although her argument presumes that such an evaluation would have been favorable. Counsel testified at the motion for new trial hearing that she did not know when the most recent psychological evaluation of Mother had occurred because, according to counsel,

> [Mother] got a lot of treatment without notifying me. She would change placements and I would learn about it after the fact. She was not -- I think she tried to hide her mental health challenges, the actual consequences of them. I think she tried to hide those from me. I learned a good bit of housing and treatment well after the fact.

She testified that she knew about the 2010 evaluation Dr. Ryan had performed but that she did not ask for a new one to "bolster what the State was already deeming," i.e., that Mother was doing well after her institutionalization in 2010 that had prompted Dr. Ryan's report. Counsel admitted that the admission of the 2010 report was hurtful to Mother's case and that "in the calm light of day" she probably could have done more, but she also explained that she was "trying to do

20

what [her] client [had] told [her] to do, and [Mother] respon[ded] to [her] saying we need to address these things that happened in the past."

Even if counsel had obtained a more recent psychological evaluation that supported the testimony from Dr. Habbu and other witnesses that Mother had been doing better before trial and was stable at that time, that evidence would not contradict the Department's evidence of Mother's history of being stable for the short-term but repeatedly slipping back into the unstable and erratic behavior patterns that had previously prompted the removal of her children in Michigan. We conclude and hold that Mother has not shown that her trial counsel was ineffective for failing to obtain a new psychological evaluation. *See Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Teixeira v. State*, 89 S.W.3d 190, 193–94 (Tex. App.—Texarkana 2002, pet. ref'd).

Additionally, even if a new psychological evaluation would have shown that Mother's condition had improved, such evidence would not necessarily have been as persuasive as the Department's evidence of Mother's long history of relapsing. Moreover, Mother fails to show how she was prejudiced in light of the State's eliciting testimony from its own witnesses that in the months before trial, Mother had improved mentally and was doing better. Thus, we believe that Mother has failed to show ineffective assistance under *Strickland*.

**Failure to Object to Questioning About Mother's 2010 Tax Return**

Mother also contends her counsel was ineffective for failing to object when the Department tried to impeach her by showing that she had claimed two of the

21

children as dependents on her 2010 tax return even though the two children had not lived with her that year. According to Mother, it is "simply another case of trial counsel sitting mute while the State scoreboards her client's bad behavior, behavior which is actually irrelevant to her ability to take care of her children, but highly prejudicial to her character."

The Department points out that Mother's ability to manage her finances, including the social security payments she had received for the children when they were living with her, was one of the key issues at trial. Of the approximately $3,000 to $4,000 she had received from her tax return, in addition to other sources of income, she had only $220 remaining at the time of trial on April 11, 2011. Thus, in context, the Department's line of questioning was aimed more at highlighting Mother's continued inability to handle her finances well, one of the Department's concerns. This is borne out in the Department's only reference to the tax refund in closing argument:

> [S]o tell me how you're going to manage your funds. You've already told us -- well, you don't really remember, but maybe some kind of three or four thousand you got back on your tax return -- and let me tell you, if you manage to get a refund, you know how much it is. She didn't, okay? You all weigh her credibility. But she had three or four thousand dollars and then she had the insurance money she got back from the U-Haul storage. Where is all that? Why are you down to 220 dollars some four months later and you're coming in here talking about you want custody of your children?

Mother does not say on what basis counsel should have objected although it appears to be under rule 403. However, we believe that, here, the evidence as to Mother's inability to manage her finances is not substantially more prejudicial

22

than probative as it shows her continued problems with basic life skills even though her mental status appeared to have temporarily improved as trial approached. Thus, we conclude and hold that Mother's trial counsel was not ineffective for failing to object to the questions regarding her 2010 tax return.

**Failure to Meet Deadline For Out-of-State Witnesses To Testify**

Finally, Mother claims that her trial counsel was ineffective for failing to meet a deadline agreed to by the parties in pretrial conference, and as a result, none of Mother's out-of-state witnesses were allowed to testify via Skype. Specifically, Mother points to the following:

> [Mother's counsel]: Your Honor, we're going to ask that my client's family and friends from Michigan be allowed to offer testimony by way of Skype in that they're -- what they have to tell is germane based on how [Mother] has a history of accessing resources and asking for help when she needs it, because her history in Texas is very brief, and yet these people have known her her whole life. I'd like to offer her testimony to show that she is a responsible parent and does make plans for when her mental health overwhelms her. We had discussed this at the pretrial hearing, and the option of offering this testimony by Skype was put on the table and we'd like to offer those witnesses that way.
>
> THE COURT: Any objections to that?
>
> [Counsel for the Department]: The Department objects, Your Honor. My recollection from the pretrial, in addition to [Mother's counsel] and I came here to the courthouse last Friday, I believe it was, April 15th, she and I came to the courthouse and reviewed the transcript from the pretrial conference, and at that time, the Court did in fact indicate that if Skype was going to be used, if that needed to be happening, we needed to know what was going to be happening with that by April 12th, and that April 12th time came and went with no notice that it was going to be used. In addition to that, I had a conversation on the, I guess, the Monday prior -- I guess it was actually on the 12th, we had a conversation with [Mother's counsel]

23

about Skype and she had indicated at that time that it wasn't set up, she didn't believe it was going to be happening, so to that extent, I'd ask the Court to deny the request for her to be able to use it, and I don't think it's set up at this time in addition to all that. I have witnesses in Michigan that would have been perhaps testifying as well if in fact that Skype was going to be used. I just wasn't going to go through the effort to try and get it done because I lacked the resources and finances to do it through the Department.

THE COURT: All right. I'll sustain the objection.

Mother contends that her trial counsel's request "veered very close to making a false statement to the [c]ourt . . . because she had already disclosed to Ms. Robinson that she 'believed it wasn't going to be happening' the week before." In addition, Mother contends that this is another example of counsel's not being adequately prepared for trial so that she could present "a coherent alternative" to the Department's case.

Mother does not say what those witnesses would have testified to. But Mother's trial counsel testified at the motion for new trial hearing that the witnesses Mother wanted her to call "consistently told about incidents and episodes that would sink her case." Mother also said that some of the witnesses would have testified about incidents closer to the trial, which would have undermined the defense that Mother had improved and was stable. Thus, although counsel did not explain why she did not make the Skype arrangements earlier, she did provide testimony that the witnesses' testimony would not have been favorable to Mother. *See Damian v. State*, 881 S.W.2d 102, 111 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (op. on reh'g).

24

Having reviewed the record and Mother's arguments, we conclude and hold that she has not shown that the trial court's judgment is reversible because of ineffective assistance of trial counsel. We overrule Mother's sole issue.

**Conclusion**

Having overruled Mother's and Father's sole issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED: August 2, 2012