United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 28, 2005**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 18, 2005

In the United States Court of Appeals

For the Fifth Circuit

_____

No. 04-40419

_____

KATHY YOLANDE MILLER,

                         Petitioner - Appellant,

                    versus

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

                         Respondent - Appellee.

_____

Appeal from the United States District Court
For the Southern District of Texas, Victoria Division

_____

Before HIGGINBOTHAM, WIENER, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

     Kathy Miller appeals the district court's denial of her § 2254 petition seeking relief from her sentence for engaging in deadly conduct by riddling the unoccupied home of her in-laws with rifle fire. We conclude that the state court's decision that Miller was not prejudiced by her counsel's failure to conduct a constitutionally adequate investigation into her mental disabilities is an objectively unreasonable application of settled federal law and reverse.

Miller was charged and convicted by a jury for the offense of deadly conduct in violation of Texas Penal Code § 22.05(b).[1] The evidence showed that Miller had been married to Larry Miller, the son of Maxine Prismeyer and brother of Laura Kainer. Larry died of a drug overdose, and although members of the Prismeyer and Kainer families blamed Miller for his death, she was never charged. Approximately one year after Larry's death, Maxine Prismeyer and her husband Alfred left their nearly completed home in El Campo, Texas, in the care of Laura Kainer and her husband, Charles Kainer, for a weekend. The Kainers stayed in a mobile home located directly behind the Prismeyer residence.

At approximately 2:00 a.m. on December 19, 1998, six rounds from a .35 caliber rifle were fired into the Prismeyer residence. Four of the bullets passed through the residence and struck the mobile home in which the Kainers were sleeping. Charles Kainer exited the mobile home and saw a truck driving away on the road fronting the Prismeyer house. Shortly thereafter, local police spotted Miller's truck abandoned in a ditch. Miller, who had been drinking earlier in the evening, was found riding a tractor a short distance away. She admitted that she had driven her truck into the ditch and had walked home carrying her .35 caliber rifle. A DPS

---

[1] TEX. PENAL CODE ANN. § 22.05(b)(2) (Vernon 2003) ("A person commits an offense if he knowingly discharges a firearm at or in the direction of . . . a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied.").

firearms examiner matched the casings recovered at the scene of the crime to Miller's rifle.

At the punishment phase of Miller's trial, the State presented evidence that at various times prior to the shooting, Miller had swerved her vehicle into the path of the Kainers' automobile, given the Kainers "the finger," and mouthed the words "I am going to get you" to the Kainers while in the checkout line at an HEB grocery store. The State also presented evidence that Miller had been charged with resisting arrest while being apprehended on the deadly conduct charge, and had been charged with public intoxication and disorderly conduct one week before her sentencing.

Miller's ex-husband testified on behalf of the defense that, in 1994, Miller was hospitalized for several weeks after suffering head injuries in a severe car accident. He stated that as a result of her accident, she suffered from reverse forward amnesia, post-traumatic stress disorder, and severe clinical depression, requiring extensive medication and the care of numerous physicians. He pointed out that before her accident, Miller had been an industrious and responsible worker. Miller's aunt testified that Miller was a good person, and that she hoped to move to Louisiana to care for her elderly mother after the trial.

Miller testified that she had never been arrested prior to her husband's death. She claimed that she was taking several medications on account of her accident, and was seeing a number of physicians, including a neurologist and some psychiatrists. She

3

stated that she was suffering from a variety of ailments, including memory loss, severe migraine headaches and a "white matter disease" that had to be monitored using "MRI's every so often to see if it's still growing." She asserted that, as a result of her condition, she had no memory of the shooting incident and could not recall mouthing the words "I am going to get you" to the Kainers.

On cross-examination, the prosecutor pointed out that Miller did not have a close relationship with her mother and had not returned to care for her mother even though she lived only 150 miles away. He also assailed Miller's claim that she was suffering from memory loss, insinuating that her testimony on this score was a fabrication.[2] In closing argument, the prosecutor opined:

---

[2] This is exemplified in the following exchange between Miller and the prosecutor:

A. [Miller] I don't recall ever going by and shooting their house up. If I did, I apologize for it; but I do not recall doing it.

Q. [Prosecutor] Oh, gee, you are sorry you almost killed the Kainers. Is that what you are saying?

A. I never said I killed the Kainers, and I never said I tried to. I said--I don't remember.

Q. You have a very selective memory, don't you?

A. Would you like to call my doctor? I cannot--I have memory loss. I have--I had amnesia whenever I was in the car wreck. I was unconscious for a long time, and my memory comes and goes.

Q. Well, let's talk about your amnesia. You seem to have amnesia that night, but you just got through giving us very specific details about those incidents at Weiners and HEB and you remember exactly what happened then when it's self-serving.

*****

A. Ask me if I remember anything from yesterday. I couldn't tell

4

> And what a wonderfully selective memory she has. She can remember so many specific details about her employment and those types of things. She can remember specific details about being on the tractor and not being intoxicated. She can remember specific details that happen at HEB, but she just doesn't have a clue what could have happened out there on County Road 355 on December the 19th. What does that look like? You have common sense, ladies and gentlemen. I think you perfectly well know.

The jury imposed a sentence of eight years and a $5,000 fine, and did not recommend that Miller's sentence be suspended.

After sentencing, Miller's trial counsel, Richard Manske, asked Miller if she knew of any evidence that might convince the court to grant a new trial. Miller told him the names of several doctors who were treating her for medical and psychiatric problems resulting from injuries she sustained in her car accident. Manske contacted internist Arthur Tashnek, neurologist Leonard Hershkowitz, and clinical psychologist Robert Borda, and obtained letters from each regarding Miller's condition.

In his letter, Dr. Tashnek stated that Miller had been a patient of his since 1991, and that she was suffering from "post-traumatic stress disorder ["PTSD"], gastro esophageal reflux disorder, irritable bowel syndrome, degenerative disk disease, memory loss, severe anxiety and depression, and retrograde

---

> you if I did or I don't because I don't remember nothing from yesterday.

Q.    I bet you don't.

5

amnesia." He noted that she was required to maintain a regular regimen of medications, and that her health would suffer significantly if these medications were not administered.

Dr. Hershkowitz wrote in his letter that Miller was suffering difficulties with cognitive function, and diagnosed organic brain syndrome. He noted that Miller's condition had been documented on "several very sophisticated neuropsychological tests," but admitted that he was unaware of her prognosis or general condition.

Finally, Dr. Borda stated in his letter that he had tested Miller at the request of Dr. Hershkowitz, and had found indications of PTSD and post-concussion syndrome. He noted that patients with severe PTSD exhibit marked feelings of vulnerability, suffer from depression and high anxiety, and may appear paranoid. According to Dr. Borda, testing had revealed that Miller suffered from "cognitive rigidity and poor problem-solving skills which typically are seen in injuries involving the frontal lobe." Although he had not seen Miller in over four years, he stated that her condition likely had not changed appreciably, and that imprisonment may exacerbate her PTSD, requiring "intense psychiatric intervention."

Armed with this evidence, Miller filed an unsuccessful motion for new trial. Her conviction was then affirmed on direct appeal,[3] and she filed a state habeas application alleging, *inter alia*, that Manske was ineffective for failing to investigate and present

---

[3] *See Miller v. State*, No. 13-00-082-CR (Tex. App.--Corpus Christi July 12, 2001, pet. ref'd) (unpublished).

evidence from Miller's doctors about her mental and emotional problems. Attached to her state habeas application was an affidavit prepared by Manske in which he admitted that he "did not prepare much for the punishment phase because I thought that Ms. Miller would accept the plea bargain offer of deferred adjudication probation." He conceded that he could have obtained the doctors' letters before the punishment phase of the trial, and stated that in retrospect, he "should have interviewed her doctors before trial and called them to testify in mitigation of punishment." The Texas Court of Criminal Appeals denied Miller's application without written explanation.[4]

Miller filed a petition under 28 U.S.C. § 2254 in the Federal District Court for the Southern District of Texas. The court denied Miller's petition and granted the State's motion for summary judgment.[5] The court observed that admission of Miller's medical evidence was within the trial court's discretion, and that Manske could not be faulted for failing to offer it because it established no connection between Miller's mental condition and her illegal actions. Further, the court held that Miller was not prejudiced by Manske's failure to present the medical evidence because Miller and her ex-husband had testified regarding her condition, and the evidence showed that "Miller was guilty of the crime, had previous

---

[4] *Miller v. State*, No. 55,281-01 (Tex. Crim. App. Mar. 26, 2003).

[5] *Miller v. Dretke*, No. V-03-41 (S.D. Tex. Mar. 25, 2004) (unpublished).

7

run-ins with the law, and had attempted to intimidate witnesses."[6]

Miller filed a notice of appeal, and the district court denied her application for COA. A single judge of our court granted COA on Miller's claim that Manske was "ineffective during the punishment phase of the trial because he failed to present expert testimony regarding Miller's medical and psychological problems."[7]

## II

### A

This appeal is governed by the Antiterrorism and Effective Death Penalty Act, which provides that habeas relief may not be granted unless the challenged state court proceeding resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."[8] A decision must be more than merely incorrect in order to constitute an unreasonable application of federal law; it must be objectively unreasonable.[9] Habeas relief is

---

[6] *Id.* at 10.

[7] *Miller v. Dretke*, No. 04-40419, at 2 (5th Cir. Aug. 16, 2004) (unpublished order).

[8] 28 U.S.C. § 2254(d)(1); *see Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (holding that AEDPA applies to all federal habeas applications filed on or after April 24, 1996). Because Miller's ineffective assistance claim involves mixed questions of law and fact, it is reviewed under § 2254(d)(1). *See Martin v. Cain*, 246 F.3d 471, 475-76 (5th Cir. 2001) (mixed questions of law and fact reviewed under unreasonable application prong of § 2254(d)); *Moawad v. Anderson*, 143 F.3d 942, 946 (5th Cir. 1998) (ineffective assistance of counsel claims involve mixed questions of law and fact).

[9] *See Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Young v. Dretke*, 356 F.3d 616, 623 (5th Cir. 2004).

8

"inappropriate when a state court, at a minimum, reaches a 'satisfactory conclusion.'"[10]

Because we review only the reasonableness of a state court's ultimate decision, the AEDPA inquiry is not altered when, as in this case, state habeas relief is denied without a written opinion.[11] In this situation, we assume "that the state court applied the proper 'clearly established Federal law,'" and then determine "whether its decision was 'contrary to' or 'an objectively unreasonable application of' that law."[12]

We review the federal district court's factual findings for clear error and its conclusions of law *de novo*.[13]

B

On appeal, Miller contends that the state court judgment is an unreasonable application of "clearly established Federal law, as determined by the Supreme court," citing *Strickland v. Washington*, because Manske's failure to adequately investigate her mental condition, contact her physicians, and present expert medical testimony at the punishment phase of her trial constitutes

---

[10] *Morrow*, 367 F.3d at 313 (quoting *Williams v. Taylor*, 529 U.S. 362, 410-11 (2000)).

[11] *See Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003) (citing *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001), *cert. denied*, 535 U.S. 982 (2002); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)).

[12] *Id.* (quoting *Catalan v. Cockrell*, 315 F.3d 491, 493 & n.3 (5th Cir. 2002) (quotation omitted)).

[13] *See Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004); *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001).

ineffective assistance of counsel.  Our analysis of this claim is controlled by the two-prong test of deficient performance and prejudice set forth in *Strickland v. Washington*.[14]  We will examine the application of each prong in turn.

1

We first consider whether the state court unreasonably applied *Strickland* in concluding that Manske did not perform in a constitutionally deficient manner at the punishment phase of Miller's trial.  In order to "establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'"[15]  Our scrutiny of counsel's performance must be highly deferential, and we must presume that counsel's conduct falls within the wide range of reasonable professional assistance.[16]  Further, we must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"[17] To this end, a "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective

---

[14] 466 U.S. 668, 687 (1984).

[15] *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688).

[16] *See Soffar v. Dretke*, 368 F.3d 441, 471 (5th Cir. 2004).

[17] *United States v. Harris*, 408 F.3d 186, 189 (5th Cir. 2005) (quoting *Strickland*, 466 U.S. at 689).

10

assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."[18]

However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[19] When assessing the reasonableness of an attorney's investigation, we must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[20] To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial.[21]

Turning to the facts of this case, we note that Manske was aware prior to the commencement of the punishment phase of Miller's trial that Miller had suffered mental and emotional injuries as a result of her car accident. Manske was also cognizant of the fact that these injuries comprised mitigating evidence, as indicated by his decision to elicit testimony about them from both Miller and

---

[18] *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (citations and internal quotation marks omitted).

[19] *Wiggins*, 539 U.S. at 521 (internal quotation marks and alteration omitted) (quoting *Strickland*, 668 U.S. at 690-91).

[20] *Id.* at 527.

[21] *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

her ex-husband. Despite this knowledge, Manske failed to contact Miller's treating physicians, and made no effort to call them as expert medical witnesses at trial.

We are mindful that "complaints of uncalled witnesses are not favored" given that "the presentation of testimonial evidence is a matter of trial strategy."[22] In this case, however, Manske made his decision not to call Miller's physicians as witnesses without speaking to them, and without even procuring their names. In his affidavit, Manske offers no tactical or strategic explanation for this lack of investigation. Rather, he points to his erroneous belief that Miller would accept the State's plea bargain offer, and that Miller would be acquitted or given probation if she refused to accept the offer, as grounds for his failure to adequately prepare for the punishment phase of trial.

The State hastens to add that Manske could reasonably have declined to pursue the testimony of Miller's physicians because he could reasonably have believed that such evidence would not have been admitted at trial. We find this rationale unconvincing. Under Texas law, psychological evidence is admissible in a non-capital trial at the punishment stage if it is relevant to

---

[22] *Wilkerson v. Cain*, 233 F.3d 886, 892-93 (5th Cir. 2000) (citation and internal quotation marks omitted).

12

sentencing.[23]  In *Muhammad v. State*,[24] the El Paso Court of Appeals held that a trial court abused its discretion when it excluded psychological evidence showing that a defendant's calm demeanor after shooting his girlfriend was attributable to his introspective personality which affected his ability to express his emotions openly.  The court found this evidence to be reliable and relevant to the defendant's heat of passion defense.[25]  In reaching this conclusion, the court observed that "[m]itigating circumstances relevant to punishment are circumstances which will support a belief that defendants who commit criminal acts that are attributable to such circumstances are less culpable than others who have no such excuse."[26]

Applying these standards, the testimony of Dr. Borda and Dr. Hershkowitz likely would have been admissible at the punishment phase of Miller's trial.  Dr. Borda is a licensed psychologist who based his diagnosis on neuropsychological testing he conducted on

---

[23] TEX. CODE. CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon Sup. 1999)("[E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing[.]").

[24] 46 S.W.3d 493 (Tex. App.--El Paso 2001, no pet.).

[25] This analysis tracks Texas's test for evaluating the admissibility of scientific evidence in criminal trials.  First, the evidence must be "reliable (and thus probative and relevant)[,]" and second, the evidence must not be "*un*helpful to the trier of fact for other reasons." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992); *see* TEX. R. EVID. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.").

[26] *Muhammad*, 46 S.W.3d at 498.

13

Miller.  He diagnosed Miller as suffering from PTSD and possible mild traumatic brain injury resulting in feelings of vulnerability, depression, high anxiety, appearances of paranoia, attentional deficits, emotional "blunting," cognitive rigidity and poor problem-solving skills.  He noted that incarceration in a typical prison setting would exacerbate Miller's PTSD, requiring intense psychiatric intervention.  Doctor Hershkowitz, in turn, is a neurologist and Diplomat of the American Board of Neurology and Psychiatry, and noted that Miller's mental problems had been "documented on several very sophisticated neuropsychological tests."  Dr. Hershkowitz stated that Miller has "memory problems" and "a problem with cognitive function," and diagnosed her as having organic brain syndrome.[27]

This evidence would likely have been relevant at the punishment stage of Miller's trial in a variety of ways.  First, evidence that Miller had PTSD would have mitigated the effect of Miller's prior charges for resisting arrest and disorderly conduct by providing an explanation for her erratic, paranoid, and hostile behavior.  This evidence would also have provided an explanation for the shooting incident given that the Prismeyers and Kainers

---

[27] Organic brain syndrome is marked by "Psychiatric or neurological symptoms, including problems with attention, concentration, and memory, confusion, anxiety, and depression, arising from damage to or disease in the brain."  *See* MedicineNet.com, MedTerms Dictionary, Organic Brain Syndrome, *at* http://www.medterms.com/script/main/art.asp?articlekey=11781 (last visited July 21, 2005).

14

blamed Miller for the death of Larry Miller.[28]   Further, evidence

that Miller had memory problems stemming from organic brain disease

would have provided support for her claim that she could not

remember the shooting incident or the altercation at HEB--a claim

that was effectively dismantled by the State's vigorous cross-

examination and closing argument.[29]   Finally, the jury could have

inferred based on the fact that Miller had not sought treatment in

roughly four years that her condition could be improved with

consistent therapy, thus building a better case for probation.

The State also contends that Manske made an informed and

reasonable tactical decision to forego investigation into Miller's

mental condition in order to focus his limited resources on more

promising defenses.  The State points out that Manske was aware of

Miller's condition, and argues that his prediction that Miller

would either accept a plea bargain or be acquitted was reasonable.

This argument misses the point.  While Manske may have made

reasonable tactical decisions based on the information that he had

at the time, our review must focus on whether the information he

---

[28] At Miller's trial, Alfred Prismeyer testified that his wife, Maxine, had told Miller that she wanted Miller dead.  He qualified this testimony by noting that "she didn't mean it."  While likely not constituting a threat on Miller's life, it would have taken on new significance in light of evidence that Miller suffered from PTSD.

[29] We need not pause over the State's argument that testimony from Miller's physicians would have been inadmissible because they could not irrefutably establish a "nexus" between Miller's criminal acts and her mental condition.  The test for admissibility is *relevance*, and a jury presented with such testimony could logically *infer* the necessary connection. *Cf. Muhammad*, 46 S.W.3d at 498-99 (noting that Texas trial courts enjoy "wide latitude in admitting relevant evidence so long as its admission is otherwise permitted by the rules of evidence").

15

possessed would have led a reasonable attorney to investigate further.[30] "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'"[31] To this effect, we have held on a number of occasions that a criminal defense attorney has a duty to investigate a client's medical history when it becomes clear that the client is suffering from mental difficulties rendering him insane or incompetent to stand trial.[32]

While not presenting a potential bar to prosecution, Miller's claim that she was suffering from mental and emotional injuries, including selective amnesia and PTSD, was significant in that it constituted a basis for minimizing her culpability. Manske recognized this fact as indicated by his decision to present

---

[30] *See Wiggins*, 539 U.S. at 536 (finding that counsel is not in a position to "make a reasonable strategic choice" when his "investigation supporting [that] choice was unreasonable"); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (finding that "our usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of [] ineffective investigatory steps").

[31] *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688).

[32] *See Bouchillon*, 907 F.2d at 597 (observing that, in the context of assessing a client's competence to stand trial, "[i]t must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of a client's history of mental problems"); *Profitt*, 831 F.2d at 1249 (holding that counsel had a duty to investigate the mental health history of a defendant who has been committed to a mental institution); *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981) (holding that counsel had a duty to obtain medical records and speak with treating physicians upon learning that his client had been confined twice to a state mental institution, and had a "guarded" prognosis).

evidence of Miller's condition via the testimony of Miller and her ex-husband. He failed, however, to make any effort to contact Miller's treating physicians or otherwise obtain some medical substantiation for her assertions. Rather, he relied solely on the testimony of Miller and her ex-husband--testimony that was ridiculed and discredited by the prosecution. This decision was supported by a complete lack of investigation; a failure that was constitutionally inadequate under the circumstances of this case. The state habeas court apparently concluded otherwise. Although it is true that the state court could have considered that the jury heard this same evidence from Miller's former husband and from Miller herself, and that the evidence would have been redundant, we think such a holding was objectively unreasonable. The state habeas court was objectively unreasonable in holding otherwise.

2

We now turn to Miller's claim that the state court unreasonably applied *Srickland* when it concluded that she was not prejudiced by Manske's inadequate investigation. In order to establish prejudice under *Strickland*, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[33] A reasonable probability is "a probability sufficient

---

[33] *Strickland*, 466 U.S. at 694.

to undermine confidence in the outcome."[34]  When assessing the prejudice caused by counsel's failure to present potentially mitigating evidence, "we reweigh the evidence in aggravation against the totality of available mitigating evidence."[35]

Because Miller is challenging a sentence imposed in a state court proceeding, she must establish a reasonable probability[36] that but-for Manske's errors, her sentence would have been "*significantly* less harsh."[37]  In deciding whether a sentence would have been significantly less harsh but-for counsel's error, we consider a number of factors including:

> the actual amount of the sentence imposed on the defendant by the sentencing judge or jury; the minimum

---

[34] *Id.*

[35] *Wiggins*, 539 U.S. at 534.

[36] The Supreme Court has observed that "[t]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2340 n.9 (2004).

[37] *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993).  Miller argues that the "significantly less harsh" standard does not apply because the Texas Court of Criminal Appeals does not employ such a standard.  This argument is wide of the mark.  In *Spriggs*, we held that

> [i]n order to avoid turning *Strickland* into an automatic rule of reversal in the non-capital sentencing context, we believe that in deciding [] an ineffectiveness claim, a court must determine whether there is a reasonable probability that but for trial counsel's errors the defendant's non-capital sentence would have been *significantly* less harsh.

993 F.2d at 88.  In *United States v. Grammas*, we held that the Supreme Court's decision in *Glover v. United States* abrogated the significantly less harsh standard.  *United States v. Grammas*, 376 F.3d 433, 438 (5th Cir. 2004) (citing *Glover v. United States*, 531 U.S. 198, 203 (2001)).  We later clarified, however, that *Glover*'s impact was limited to cases involving the federal sentencing guidelines.  *Grammas*, 376 F.3d at 438 n.4.  Because Miller was sentenced in state court, the significantly less harsh standard applies to her ineffective assistance claim.

and maximum sentences possible under the relevant statute or sentencing guidelines, the relative placement of the sentence actually imposed within that range, and the various relevant mitigating and aggravating factors that were properly considered by the sentencer.[38]

In its charge to the jury, the state trial court explained that the punishment authorized for a third degree felony is imprisonment for any term of not more than ten years or less than two years, and a fine not to exceed $10,000.00. The court also instructed the jury that they were allowed to recommend a suspended sentence and community supervision. The jury assessed a sentence of eight years imprisonment and a $5,000.00 fine, and did not recommend that the sentence be suspended. This sentence falls at the higher end of the sentencing range.

Turning to the relevant mitigating and aggravating factors considered by the jury, the evidence showed that Miller fired multiple rounds from a .35 caliber rifle into a residence, and struck a mobile home occupied by a sleeping couple in the early morning hours; that Miller had attempted to threaten and intimidate at least one of the witnesses against her, and had previously been arrested for public intoxication and disorderly conduct. Miller proffered evidence that she had been involved in an automobile accident and was suffering from memory loss and PTSD. She also testified that she did not remember firing on the Prismeyer residence or threatening the Kainers, but if she had done so, she

---

[38] *Spriggs*, 993 F.2d at 88-89.

19

was "sorry."

On cross-examination, the State severely undermined Miller's claims by pointing out that her memory was "selective," and that the jury could decide for itself what to make of her alleged memory loss. Had Manske investigated Miller's medical history and interviewed her physicians, he could have countered the State's insinuations with actual medical evidence. Instead, he allowed the trial to proceed to closing argument without conducting redirect examination on Miller in an attempt to rehabilitate her credibility.

In addition, had Manske investigated Miller's medical history and presented expert testimony regarding her PTSD, he could have offered an explanation for why the accusations leveled by the Kainers and Prismeyers, as well as the threatening statement made by Maxine Prismeyer, produced such an unusually severe reaction from Miller. As things stood, the jury was left only with the admittedly self-serving testimony of Miller and her ex-husband regarding her medical condition, and could easily have dismissed such testimony as not credible. Had the jury been allowed to consider expert testimony presented by even one of Miller's treating physicians, the entire case would have been cast in a new light; namely, Miller would have been viewed as a sick woman, and her actions those of a person debilitated in mind as well as body. Accordingly, we find that a reasonable probability exists that the jury would have assessed a substantially less harsh sentence but-

for Manske's failure to present such evidence. Further, given the radical shift in terrain Miller's defense would have experienced had Manske called Drs. Borda and Hershkowitz, we find the state habeas court's rejection of Miller's petition objectively unreasonable. We recognize that the state court could have concluded that the sentence would be equally as harsh or even more harsh because the testimony of the doctors would have emphasized the dangerousness of the defendant. We find, however, that such a conclusion is an objectively unreasonable application of *Strickland*, because we assume that the jury would have sentenced to some degree on the basis of Miller's moral culpability and the testimony of these doctors would have given the jury a firm basis to conclude that Miller was much less morally culpable for her crime than the jury could have concluded without such testimony.

## III

To sum up, we hold that the state court judgment that counsel was not ineffective is an objectively unreasonable application of *Strickland*. Manske provided ineffective assistance to Miller by failing to conduct reasonable investigation into Miller's mental injuries by not contacting her physicians. This failure to investigate prejudiced Miller by permitting the State to neutralize her most effective mitigation evidence, undermine her credibility, and portray her as an opportunistic liar to a jury charged with determining her sentence.

21

For these reasons, we reverse the district court's judgment denying habeas relief, and remand this case to that court with instructions to order the State of Texas to either give Kathy Miller a new sentencing hearing or release her from custody within 90 days of the date of the district court's order on remand.

REVERSED and REMANDED with instructions.