02-11-200-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00200-CV

 

 


 
 
 In the Interest of S.W., K.H., K.H., K.H., K.H.,
 and K.V., Children
 
 


 

----------

 

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          T.H.
(Mother) appeals the trial court’s order, incorporating a jury’s verdict, that
the Texas Department of Family and Protective Services (Department) be named
permanent managing conservator of her children, K.H., K.H., K.H., K.H., and
K.V. and that her child S.W.’s father be named his sole managing conservator. 
K.V.’s father Q.D. (Father) appeals the same order as to K.V. only.  We affirm.

Background

          Mother
has a history of bipolar disorder since she was a teenager.  She is from
Michigan and while living there was involved numerous times with that state’s Department
of Human Services (DHS).  Five of the six children, who were between nine and
fifteen years old at the time of trial, had been removed from her in Michigan
at least twice, the latest in early 2009.  The youngest child, who was two
years old at the time of trial, had also been removed in Michigan in 2009.  In
that case, the trial court dismissed a termination suit because Mother had
addressed the factors that caused the removal.  After that case was closed,
Mother moved to Texas.

In November 2009, the Department received a
referral about the children but did not remove them at that time.  After
receiving phone calls from two of the children in December 2009, the Department
removed the children based on allegations of neglect and possible physical
abuse due to Mother’s psychological issues.

          The
Department filed a suit for conservatorship and, alternatively, termination.  The
trial court extended the dismissal deadline in this case once.  By the time of
trial, the Department was no longer seeking termination of the rights of Mother
or of the children’s fathers.[2]  A jury found that the
Department should be the permanent managing conservator of K.H., K.H., K.H.,
K.H., and K.V. and that S.W.’s father should be his managing conservator.  The
trial court’s order names Mother possessory conservator of all six children and
provides that she have two-hour supervised visitation with five of them every
other week; because S.W.’s father was named his managing conservator, the trial
court ordered that reasonable visitation with Mother be established by
agreement if possible.  The order also names Father possessory conservator of
K.V. and provides that he have two-hour supervised visitation with her every
other week.

Father’s
Appeal

          Father
raises a single issue in his appeal, which he also included in a statement of
points.  Father contends that the trial court erred by admitting Exhibit 18, a
copy of a home study request and results on Father’s home in Michigan.  Father
objected to the exhibit because “there was nothing supporting the
trustworthiness of the Michigan home study and there was a great deal about the
Michigan home study that brought its trustworthiness into question.”

          At
trial, the Department sought to introduce the exhibit through CPS
conservatorship worker Gale Davis, who had been assigned the case in January
2010.  Father’s counsel objected that the document contained hearsay and that
he could not cross-examine anyone regarding the contents of the document.  The
trial court initially sustained the objection.

Later,
Davis testified on redirect that she was the custodian of CPS files for this
case, that the files are records kept in the ordinary course of business, that
she had general knowledge of the files, and that she had incorporated documents
into the file as she received them.  On voir dire, she testified that exhibit
18 was a packet of documents responsive to her request through the Interstate
Compact on the Placement of Children to conduct a home study on Father.  She
complied with the rules on submitting such a request.  The Interstate Compact
Placement Request form has two signatures:  one from a Texas official and one
from a Michigan official.  Davis’s supervisor, Bose Oludipe, reviewed the
document upon receipt, as evidenced by her signature on the request form.

Davis
testified that in determining the reliability of the memorandum from Michigan
DHS attached to the request, she relied on the fact that it was done in
compliance with the Interstate Compact.  The Department offered the records
under the hearsay exceptions set forth in rules 803(6) and (8) of the rules of
evidence, the business records and public records exceptions, respectively. 
Tex. R. Evid. 803(6), (8).  The trial court admitted the exhibit over Father’s
well-developed hearsay, foundational, and Confrontation Clause objections.

          Exhibit
18 contains a cover page from the Department’s Interstate Compact Office with a
box checked next to each of the following:  (1) “ICPC 100A:  . . . Denial”
and (2) “Interstate services appear complete.  Our Interstate case is closed[.]” 
It is addressed to the attention of Dale Murray.  At the bottom is a
handwritten note:  “Denied.  B. Oludipe CVS Supervisor II 3/14/11.”  The next
page is on Michigan Department of Human Services letterhead and has the same
boxes checked, plus a box for “Home Evaluation.”  The next page is a form
entitled, “Interstate Compact Replacement Request” to Genesee County Michigan
from the Department.  Under the “Services Requested” box, “Parent Home Study”
is checked, and under the box “Placement Information” box, Father is listed. 
Signatures are included in two sections, “Signature of Sending State Compact
Administrator or Alternate” and “Signature of Receiving State Compact
Administrator or Alternate.”  Under “Action by Receiving State,” the box “Placement
Shall Not Be Made” is checked.  A lab report showing DNA test results of
Father’s paternity of K.V. is included.  And finally, the exhibit contains a
memo to Dale Murray, Interstate Compact, from Cheryl Henry, Foster Care
Manager, by Amanda Kulaszewski, Foster Care Specialist, stating that when
Michigan DHS contacted Father, he disclosed that he had a felony conviction in
1982 and that he lived with another man, about whom he would not provide the
information necessary to run background checks.  The memo also states that a
“LIEN and Central Registry” check was performed on Father, revealing the
following:

●        “a
current PPO against him not expiring until March 2011”;

●        in
1981, he was charged with two counts of “1100 sexual assault”[3]
and two counts of “1000 kidnapping” and received a ten to fifteen year
sentence;

●        also
in 1981, he was charged with one count of “2300 Larceny”;

●        in
November 2008, he was charged with one count of misdemeanor larceny;

●        in
September 2010, he was charged with one count of “1300 ordinance violation
assault excluding sexual” and was convicted of “Ordinance Violation Stalking”;
and

●        he
is on the Central Registry “for hitting his minor daughter . . . on November
14, 2006, in the head and breaking her blood vessels in her eye while she was
pregnant.”

Based
on the above, the memo concludes, “At this time Genesee County DHS does not
feel it would be appropriate to proceed with a home study given [Father’s]
criminal and central registry history.  We are at this time denying the request.”

          Father’s
primary argument against admissibility of the exhibit is that nothing in it
shows how Michigan prepared its response to the Department’s request, and Davis
did not testify that she had personal knowledge of how Michigan prepared its
response.  Specifically, Father argues that nothing shows how Michigan
identified Father as the person with the criminal history mentioned in the memo
or whether it ruled out other men with the same name.[4]

          Documents
are admissible under rule 803(8) if they are (1) “[r]ecords, reports,
statements, or data compilations, in any form, of public offices or agencies
setting forth . . . matters observed pursuant to duty imposed by law as to
which matters there was a duty to report” or (2) “factual findings resulting
from an investigation made pursuant to authority granted by law . . . unless
the sources of information or other circumstances indicate lack of
trustworthiness.”  Tex. R. Evid. 803(8).  Rule 803(8) creates a presumption of
admissibility; it is the burden of the party opposing admission to show that a
document proffered under this hearsay exception is untrustworthy.  1001
McKinney, Ltd. v. Credit Suisse First Boston Mtg. Capital, 192 S.W.3d 20,
28 (Tex. App.––Houston [14th Dist.] 2005, pet. denied).

          Texas
law provides that before placing a child with a relative, the Department must
conduct an investigation to determine whether the proposed placement is in the
child’s best interest.  Tex. Fam. Code Ann. § 264.754 (West 2008).  In
obtaining a home study on an out-of-state relative, the Department must comply
with the Interstate Compact on the Placement of Children (ICPC), which requires
the other state’s authorities to inform the Department in writing “that the
proposed placement does not appear to be contrary to the interests of the child”
before the Department may send or bring a child, or cause a child to be sent or
brought, to that state.  Id. § 162.102, art. III, sec. (d) (West 2008). 
Thus, for the Department to even consider here whether K.V. could be placed
with Father, it was required to make a request to Michigan under the ICPC and
obtain assurance from Michigan that such a placement would not be contrary to
K.V.’s best interest.  See id.  Accordingly, we conclude and hold that
exhibit 18 contains findings pursuant to an investigation taken according to
law.  See Tex. R. Evid. 803(8); Tex. Dep’t of Public Safety v.
Caruana, 363 S.W.3d 558, 564 (Tex. 2012).

          Father
nevertheless contends that the documents in the exhibit show indicia of
untrustworthiness.  Davis testified that she knew the persons named in the “from”
part of the Michigan DHS memo and that she had talked to at least one about
other cases.  She also testified that she “rel[ied] on the receiving state,
that their staff and their department [was] doing due diligence in ascertaining
all the information [that was] necessary and needed for [her] to review in
order to determine whether placement [was] appropriate.”  Indeed, the ICPC
states that the purpose and policy of the cooperating states is to, among other
things, give “[t]he appropriate authorities in a state where a child is to be
placed [the] full opportunity to ascertain the circumstances of the proposed
placement, thereby promoting full compliance with applicable requirements for
the protection of the child” and to give “[t]he proper authorities of the state
from which the placement is made . . . the most complete information on the
basis on which to evaluate a projected placement before it is made.”  Tex. Fam.
Code Ann. § 162.102, art. I, secs. (b), (c).

The
memo attached to the request forms states that direct contact was made with
Father, does not indicate that the person contacted denied knowing the purpose
of the call, and indicates that the person voluntarily admitted to a criminal
history that included a felony.  Given that in the direct conversation, the
person contacted by Michigan DHS refused to give information about his roommate
to enable DHS to make any further inquiries, DHS’s reluctance to recommend a
placement according to the ICPC does not show problems with its methodology.  Cf.
Saavedra v. Schmidt, 96 S.W.3d 533, 539 (Tex. App.––Austin 2002, no pet.)
(noting that caseworker described California home study as the worst she had
ever seen because all of the information in it came from the proposed placement
himself).  Accordingly, we conclude and hold that the trial court did not abuse
its discretion by admitting Exhibit 18 under the public records exception
contained in rule 803(8).  See Moss v. Ole South Real Estate, Inc., 933
F.2d 1300, 1306–08 (5th Cir. 1991) (explaining that, under almost identical
federal rule, general distrust of out-of-court declarants underpinning hearsay
rules does not apply to government officials preparing official documents
unless proven otherwise); Beavers ex rel. Beavers v. Northrup Worldwide
Aircraft Servs., Inc., 821 S.W.2d 669, 675 (Tex. App.––Amarillo 1991, writ
denied).  We overrule Father’s sole issue.

Mother’s Appeal

          In
a single issue, Mother contends that her trial counsel was ineffective.

Standard
of Review

          To
establish ineffective assistance of counsel, the appellant must show by a
preponderance of the evidence that her counsel’s representation fell below the
standard of prevailing professional norms and that there is a reasonable
probability that, but for counsel’s deficiency, the result of the trial would
have been different.  Strickland v. Washington, 466 U.S. 668, 687, 104
S. Ct. 2052, 2064 (1984); Davis v. State, 278 S.W.3d 346, 352 (Tex.
Crim. App. 2009); see also In re M.S., 115 S.W.3d 534, 544–45 (Tex.
2003) (adopting Strickland standard for evaluating counsel’s performance
in child protection cases).

          In
evaluating the effectiveness of counsel under the first prong, we look to the
totality of the representation and the particular circumstances of each case.  Thompson
v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).  The issue is whether
counsel’s assistance was reasonable under all the circumstances and prevailing
professional norms at the time of the alleged error.  See Strickland,
466 U.S. at 688–89, 104 S. Ct. at 2065.  Review of counsel’s representation is
highly deferential, and the reviewing court indulges a strong presumption that
counsel’s conduct fell within a wide range of reasonable representation.  Salinas
v. State, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); Mallett v. State,
65 S.W.3d 59, 63 (Tex. Crim. App. 2001).  A reviewing court will rarely be in a
position on direct appeal to fairly evaluate the merits of an ineffective
assistance claim.  Salinas, 163 S.W.3d at 740; Thompson, 9 S.W.3d
at 813–14.  “In the majority of cases, the record on direct appeal is
undeveloped and cannot adequately reflect the motives behind trial counsel’s actions.” 
Salinas, 163 S.W.3d at 740 (quoting Mallett, 65 S.W.3d at 63). 
To overcome the presumption of reasonable professional assistance, “any
allegation of ineffectiveness must be firmly founded in the record, and the
record must affirmatively demonstrate the alleged ineffectiveness.”  Id.
(quoting Thompson, 9 S.W.3d at 813).  It is not appropriate for an
appellate court to simply infer ineffective assistance based upon unclear
portions of the record.  Mata v. State, 226 S.W.3d 425, 432 (Tex. Crim.
App. 2007).

          The
second prong of Strickland requires a showing that counsel’s errors were
so serious that they deprived the defendant of a fair trial, i.e., a trial with
a reliable result.  Strickland, 466 U.S. at 687, 104 S. Ct. at
2064.  In other words, appellant must show there is a reasonable probability
that, but for counsel’s unprofessional errors, the result of the proceeding
would have been different.  Id. at 694, 104 S. Ct. at 2068.  A
reasonable probability is a probability sufficient to undermine confidence in
the outcome.  Id.  The ultimate focus of our inquiry must be on the
fundamental fairness of the proceeding in which the result is being
challenged.  Id. at 697, 104 S. Ct. at 2070.

Analysis

          Mother
points to several ways in which her trial counsel was ineffective.

Opening Statement

          Mother
complains about the way trial counsel portrayed her in counsel’s opening
statement, in which she stated, among other things,

Now, let me tell you
about her as a person.  She’s eccentric.  She’s not slow to raise her voice at
me.  I’m her attorney and she tells me where to step off constantly.  She has
passion, she has opinions.  If she thinks she’s being slighted or that her
children are not getting what her children deserve, I promise you, she’s got a
short fuse, okay?  I’m not saying that doesn’t mean she can’t raise her kids.  I
know there are worse problems.

Counsel
also stated,

She’s very aggressive
about her children going to school. She’s probably irritated a half-dozen counselors
and Special Ed teachers half to death because she wants more services for her
kids that are having trouble keeping up.  She has a couple of really bright kids
and a couple that struggle, and she wants help for the ones that struggle to
help them catch up.

Finally,
counsel told the jury,

So in front of you
this week, you’re going to see a woman who is -- who’s a little bit mentally
unhealthy sometimes, okay?  So she’s not the strongest person in the room, and
she’s going to have to sit here and listen to a string of people brought in to talk
trash about her, because some of it’s true.  Sometimes she yells, she acts the
fool, she plays her radio loud.  If she doesn’t want something in the house, she
throws it out.  Crazy.  We’re talking about people.  We’re talking about a
person.  And you know what?  She has some personality traits that make her
frustrating to work with.  I’m surprised she hasn’t gone through two dozen CPS
caseworkers.  She’s practically tormented me to death, but that doesn’t mean
she’s a bad mother.  It means that she wants to push me to do a better job.  She
wants her kids in her home.  She wants them in their church, she wants them in
their schools, she wants them in their beds.

Counsel’s
entire statement, read in context, shows an attempt to mitigate the effect on the
jury of the Department’s evidence of Mother’s history of erratic behavior
related to her mental illness; counsel reinforced many times that Mother was a
good and loving parent despite her seemingly aggressive and odd behaviors.  The
theme of counsel’s opening statement, taken in context, is that although
Mother’s behavior was sometimes bizarre and offputting to others, it was
motivated by good intent and a desire to do what was best for her children.  At
one point, counsel called Mother’s care of her seriously ill daughter
“impressive.”

During
the motion for new trial hearing, counsel testified that Mother herself had
provided counsel with documentation of her mental illness and that the strategy
she intended to use at trial was to argue that the Department’s actions were
premature and that everyone acknowledged that Mother had been “quite stable” in
the months before trial.

Accordingly,
we conclude and hold that Mother has failed to show that counsel’s opening
statement was not motivated by sound trial strategy.  Cf. Bahr v.
State, 295 S.W.3d 701, 713 (Tex. App.––Amarillo 2008, pet. ref’d) (holding
that when defendant will testify in criminal case, defense strategy of bringing
out defendant’s bad history to make him or her more believable is reasonable); Jagaroo
v. State, 180 S.W.3d 793, 800 (Tex. App.––Houston [14th Dist.] 2005, pets.
ref’d) (concluding that counsel’s closing statement, as a whole, advanced
defendant’s interests).

          Evidence
of Mother’s Firing Attorneys

          Mother
contends that counsel’s failure to file a motion in limine to prevent the jury
from learning of her history of firing attorneys, failure to object to
questioning about her firing of attorneys, and failure to move for mistrial on
that basis is “conclusive[ly] indicative of trial counsel’s abandonment of her
client, and prima facie evidence of her ineffective representation.”

          According
to Mother, “[t]he deliberate efforts by the State to impugn [Mother] and
essentially demonize her by demonstrating specific instances of her bad behavior
toward her own lawyers were met without resistance, prior to and during the
trial.”  Specifically, she complains about the following exchanges during the
Department’s direct examination of Davis:

Q Would it be fair to
say that [Mother] has not just had difficulty working with you, but also with other
providers?

 

A Yes.

 

Q Is she on her 5th
attorney?

 

A She is.

 

Q And has she
routinely complained to the courts and to anyone else who would listen that no
one has given her a fair shake and everybody is mistreating her and she can’t
trust anyone and everyone is double-crossing her? Has that been her routine complaint
about the attorneys that represented her and the providers and the Department?

 

A She considers this
a false case against her.

 

. . . .

 

Q And she’s also
filed grievances against the attorneys in this case; is that correct?

 

A That’s my
understanding.

 

Q She’s filed
grievances -- we won’t call any names, but she’s probably filed some three or
four grievances against attorneys who have and have not represented her during
the pendency of this case.

 

A That’s true.

 

. . . .

 

Q Hasn’t she still
filed documents with the Court that she wasn’t supposed to file?

 

A Yes, she has.

 

Q And she wanted to
fire her lawyer just a couple of weeks ago, isn’t that correct?

 

A That’s correct.

 

. . . .

 

Q Now, over the
course of that time between December 26th -- well, just so we’re clear, on
December 28th, 2009, the Department actually came into court and got an
emergency order signed, is that correct?

 

A That’s correct.

 

Q And an attorney was
appointed to represent [Mother].

 

A Yes.

 

Q All right. Now,
between that December 28th, 2009 date and March 25th where we actually had a
show cause hearing, were there multiple settings of the actual show cause that
didn’t go forward?

 

A Yes, there were.

 

Q And during that
three-month period of time, did [Mother] fire not just one but two attorneys?

 

A That’s correct.

 

Q So did that
contribute to the delay in actually having a contested show cause hearing?

 

A Yes, it did.

 

. . . .

 

Q Also, back around
September of 2010, did [Mother] put before the Court a motion to have the ad litem
booted off the case?

 

A Yes.

 

Q And was that
declined?

 

A Yes.

 

Q All right. Did she
also ask the Court to fire her fourth attorney?

 

A Yes.

 

Q And was that
declined?

 

A Yes.

          Mother
contends that by failing to object to these questions, her trial counsel
allowed the State to improperly comment on the attorney-client relationship. 
However, this evidence is relevant to the State’s allegations that Mother had a
pattern of alternating between periods when she was stable and had her illness
under control followed by relapses in which she exhibited erratic behavior
leading to confrontations with other people, including her caseworker,
therapist, and people at a homeless shelter.[5] 
Mother does not argue on what basis the trial court would have excluded such
evidence, and considering other evidence of Mother’s behavior during this case,
it is not substantially more prejudicial than probative.  See Tex. R.
Evid. 403; Davis v. Tex. Dep’t of Family & Protective Servs., No.
03-11-00314-CV, 2012 WL 512674, at *2–4 (Tex. App.––Austin Feb. 15, 2012, no
pet.) (mem. op.).  Moreover, it is apparent that counsel’s trial strategy was
to concede Mother’s often extreme behavior while trying to show that even such
extreme behavior did not affect her ability to parent her children.  For
example, on cross-examination, she elicited from Davis that Mother is a highly
concerned parent and aggressive advocate for her children, that Davis would
rather deal with a concerned parent than a disinterested one, that Mother wants
her children to be successful, and that Mother had continually asked for more
time and unsupervised visits with them.[6]  The
fact that counsel undertook such a strategy at Mother’s insistence does not render
counsel’s performance ineffective.  See McFarland v. State, 845 S.W.2d
824, 848 (Tex. Crim. App. 1992) (“When a defendant preempts his attorney’s
strategy by insisting that a different defense be followed or by insisting that
certain evidence be put on or kept out, no claim of ineffectiveness can be
sustained.”), cert. denied, 508 U.S. 963 (1993), overruled in part on
other grounds by Bingham v. State, 915 S.W.2d 9, 14 (Tex. Crim. App. 1994). 
Accordingly, we conclude that counsel was not ineffective for failing to object
to evidence about Mother’s firing of her previous four attorneys.

Lack of Preparation

          Mother
contends, as evidenced by her trial counsel’s testimony at a motion for new
trial, that counsel was unsure about how to deal with her role in the case, was
stressed out by Mother, and showed a lack of preparation by failing to file
reasonable motions, filing unnecessary motions, and failing to subpoena one of
Mother’s counselors, Dr. Habbu, and medical records pertinent to his
testimony.  Mother does not argue how she was prejudiced (or the outcome of the
trial affected in any way) by this alleged lack of preparation other than to
say that if Dr. Habbu’s testimony “was possibl[y] harmful to [Mother], then
[counsel’s] decision to subpoena him makes no sense either.”

          At
the motion for new trial hearing, Mother’s trial counsel testified that she was
appointed six months before trial, that she had been present for Dr. Habbu’s
testimony at a temporary hearing in October 2010, and that she had repeatedly
spoken to him and his staff in March and April 2011.  She purposefully did not
subpoena Dr. Habbu’s records because she learned that some of the MHMR matters
“would be damaging” to Mother.  And she stated for the record at trial that she
had advised Mother against calling Dr. Habbu as a witness.

          Counsel
testified at the motion for new trial hearing that her client insisted that she
serve numerous unnecessary subpoenas.  Counsel also testified that Mother had
her “running 20 different directions at all times,” that Mother had tried to
fire her repeatedly, and that Mother was quite insistent about making counsel
file what she wanted and preventing counsel from filing what she did not want
filed; Mother had complained about other attorneys filing motions she did not
want filed.  Counsel refused to file motions that were beyond the scope of her
representation, however.

          Nevertheless,
counsel was able to successfully keep out some of Dr. Habbu’s records concerning
Mother, which she had determined would be damaging.  Counsel was able to elicit
from Dr. Habbu that Mother was stable, was not a danger to herself or others,
and that she was taking her medications.  The most damaging testimony elicited
from him on cross-examination was that he had only recently seen Mother twice
for around fifteen to twenty minute sessions.

Accordingly,
we conclude and hold that counsel was not ineffective in this regard.  See McFarland,
845 S.W.2d at 848; In re C.E.C., No. 02-06-00065-CV, 2006 WL 3627134, at
*2 (Tex. App.––Fort Worth Dec. 14, 2006, no pet.) (mem. op.).

Failure to Obtain More Recent Mental Health
Evaluation

          Mother
also contends that counsel should have obtained an updated mental health
evaluation closer to trial rather than relying on the one from summer 2010, and
as a result, Mother’s trial counsel unreasonably relied on the fact that the
State had acknowledged “quite clear[ly]” that Mother was doing well after being
hospitalized in December 2010.  Mother claims that this shows counsel merely
acquiesced in the State’s theory of the case.

          Mother
does not say what a new psychological evaluation would have shown although her
argument presumes that such an evaluation would have been favorable.  Counsel
testified at the motion for new trial hearing that she did not know when the
most recent psychological evaluation of Mother had occurred because, according
to counsel,

[Mother] got a lot of
treatment without notifying me.  She would change placements and I would learn
about it after the fact.  She was not -- I think she tried to hide her mental
health challenges, the actual consequences of them.  I think she tried to hide
those from me.  I learned a good bit of housing and treatment well after the
fact.

She
testified that she knew about the 2010 evaluation Dr. Ryan had performed but
that she did not ask for a new one to “bolster what the State was already
deeming,” i.e., that Mother was doing well after her institutionalization in
2010 that had prompted Dr. Ryan’s report.  Counsel admitted that the admission
of the 2010 report was hurtful to Mother’s case and that “in the calm light of
day” she probably could have done more, but she also explained that she was
“trying to do what [her] client [had] told [her] to do, and [Mother]
respon[ded] to [her] saying we need to address these things that happened in
the past.”

Even
if counsel had obtained a more recent psychological evaluation that supported
the testimony from Dr. Habbu and other witnesses that Mother had been doing
better before trial and was stable at that time, that evidence would not
contradict the Department’s evidence of Mother’s history of being stable for
the short-term but repeatedly slipping back into the unstable and erratic
behavior patterns that had previously prompted the removal of her children in
Michigan.  We conclude and hold that Mother has not shown that her trial counsel
was ineffective for failing to obtain a new psychological evaluation.  See
Miller v. Dretke, 420 F.3d 356, 361 (5th Cir. 2005); Teixeira v. State,
89 S.W.3d 190, 193–94 (Tex. App.––Texarkana 2002, pet. ref’d).

Additionally,
even if a new psychological evaluation would have shown that Mother’s condition
had improved, such evidence would not necessarily have been as persuasive as
the Department’s evidence of Mother’s long history of relapsing.  Moreover,
Mother fails to show how she was prejudiced in light of the State’s eliciting
testimony from its own witnesses that in the months before trial, Mother had
improved mentally and was doing better.  Thus, we believe that Mother has
failed to show ineffective assistance under Strickland.

Failure to Object to Questioning About
Mother’s 2010 Tax Return

Mother also contends her counsel was
ineffective for failing to object when the Department tried to impeach her by showing
that she had claimed two of the children as dependents on her 2010 tax return
even though the two children had not lived with her that year.  According to
Mother, it is “simply another case of trial counsel sitting mute while the
State scoreboards her client’s bad behavior, behavior which is actually
irrelevant to her ability to take care of her children, but highly prejudicial
to her character.”

The
Department points out that Mother’s ability to manage her finances, including
the social security payments she had received for the children when they were
living with her, was one of the key issues at trial.  Of the approximately
$3,000 to $4,000 she had received from her tax return, in addition to other
sources of income, she had only $220 remaining at the time of trial on April
11, 2011.  Thus, in context, the Department’s line of questioning was aimed more
at highlighting Mother’s continued inability to handle her finances well, one
of the Department’s concerns.  This is borne out in the Department’s only
reference to the tax refund in closing argument:

[S]o tell me how
you’re going to manage your funds.  You’ve already told us -- well, you don’t
really remember, but maybe some kind of three or four thousand you got back on
your tax return -- and let me tell you, if you manage to get a refund, you know
how much it is.  She didn’t, okay?  You all weigh her credibility.  But she had
three or four thousand dollars and then she had the insurance money she got
back from the U-Haul storage.  Where is all that?  Why are you down to 220
dollars some four months later and you’re coming in here talking about you want
custody of your children?

Mother
does not say on what basis counsel should have objected although it appears to
be under rule 403.  However, we believe that, here, the evidence as to Mother’s
inability to manage her finances is not substantially more prejudicial than
probative as it shows her continued problems with basic life skills even though
her mental status appeared to have temporarily improved as trial approached. 
Thus, we conclude and hold that Mother’s trial counsel was not ineffective for
failing to object to the questions regarding her 2010 tax return.

Failure
to Meet Deadline For Out-of-State Witnesses To Testify

Finally,
Mother claims that her trial counsel was ineffective for failing to meet a
deadline agreed to by the parties in pretrial conference, and as a result, none
of Mother’s out-of-state witnesses were allowed to testify via Skype. 
Specifically, Mother points to the following:

[Mother’s counsel]:  Your
Honor, we’re going to ask that my client’s family and friends from Michigan be allowed
to offer testimony by way of Skype in that they’re -- what they have to tell is
germane based on how [Mother] has a history of accessing resources and asking
for help when she needs it, because her history in Texas is very brief, and yet
these people have known her her whole life.  I’d like to offer her testimony to
show that she is a responsible parent and does make plans for when her mental
health overwhelms her. We had discussed this at the pretrial hearing, and the
option of offering this testimony by Skype was put on the table and we’d like
to offer those witnesses that way.

 

THE COURT:  Any
objections to that?

 

[Counsel for the
Department]:  The Department objects, Your Honor.  My recollection from the
pretrial, in addition to [Mother’s counsel] and I came here to the courthouse
last Friday, I believe it was, April 15th, she and I came to the courthouse and
reviewed the transcript from the pretrial conference, and at that time, the
Court did in fact indicate that if Skype was going to be used, if that needed
to be happening, we needed to know what was going to be happening with that by
April 12th, and that April 12th time came and went with no notice that it was
going to be used.  In addition to that, I had a conversation on the, I guess,
the Monday prior -- I guess it was actually on the 12th, we had a conversation
with [Mother’s counsel] about Skype and she had indicated at that time that it
wasn’t set up, she didn’t believe it was going to be happening, so to that
extent, I’d ask the Court to deny the request for her to be able to use it, and
I don’t think it’s set up at this time in addition to all that.  I have
witnesses in Michigan that would have been perhaps testifying as well if in
fact that Skype was going to be used.  I just wasn’t going to go through the effort
to try and get it done because I lacked the resources and finances to do it
through the Department.

 

THE COURT: All right.
I'll sustain the objection.

Mother
contends that her trial counsel’s request “veered very close to making a false
statement to the [c]ourt . . . because she had already
disclosed to Ms. Robinson that she ‘believed it wasn’t going to be happening’
the week before.”  In addition, Mother contends that this is another example of
counsel’s not being adequately prepared for trial so that she could present “a
coherent alternative” to the Department’s case.

Mother
does not say what those witnesses would have testified to.  But Mother’s trial
counsel testified at the motion for new trial hearing that the witnesses Mother
wanted her to call “consistently told about incidents and episodes that would
sink her case.”  Mother also said that some of the witnesses would have testified
about incidents closer to the trial, which would have undermined the defense
that Mother had improved and was stable.  Thus, although counsel did not
explain why she did not make the Skype arrangements earlier, she did provide
testimony that the witnesses’ testimony would not have been favorable to
Mother.  See Damian v. State, 881 S.W.2d 102, 111 (Tex. App.––Houston [1st
Dist.] 1994, pet. ref’d) (op. on reh’g).

Having
reviewed the record and Mother’s arguments, we conclude and hold that she has
not shown that the trial court’s judgment is reversible because of ineffective
assistance of trial counsel.  We overrule Mother’s sole issue.

Conclusion

Having
overruled Mother’s and Father’s sole issues, we affirm the trial court’s
judgment.

 

 

PER CURIAM

 

PANEL: 
LIVINGSTON,
C.J.; MEIER and GABRIEL, JJ.

 

DELIVERED:  August 2, 2012









[1]See Tex. R. App. P. 47.4.





[2]K.H., K.H., K.H., and K.H.
have the same father; he did not appeal from the trial court’s order naming him
a possessory conservator.





[3]It is unclear from the
record what these numbers refer to, but in context, they appear to be Michigan
code references.





[4]The Department contends on
appeal that Father did not preserve this argument by focusing solely on the
business records, and not the public records, exception.  However, Father does
argue that there is no foundation for the trustworthiness of the documents,
which is a consideration under both exceptions.  See Tex. R. Evid.
803(6), (8); Tex. Dep’t of Pub. Safety v. Caruana, 363 S.W.3d 558, 564
(Tex. 2012); Dodeka, L.L.C. v. Campos, No. 04-11-00339-CV, 2012 WL
1522179, at *4 (Tex. App.––San Antonio May 2, 2012, no pet.) (op. on reh’g). 
Thus, we address his argument.  See Tex. R. App. P. 38.1(f); Perry v.
Cohen, 272 S.W.3d 585, 587 (Tex. 2008).





[5]One of her counselors
included the following in one of his reports:

[Mother] lacks insight into how her
problematic behaviors impact others and tends to externalize.  [She] indicated,
“I suffer most from people treating me wrong.”  [Mother] perceives herself as
having less negative characteristics than most others.  [Mother] reported, “I
always tell the truth.” . . .

. . . .

[Mother’s] profile suggests someone who
tends to minimize emotional difficulties, which will be a barrier to the
rehabilitative process.  [Mother] has a history of receiving treatment services,
yet her problematic issues appear cyclical in nature with strong consequences
at times.  [Mother] lacks insight into the underlying motivations and behaviors
of her life difficulties.





[6]She also elicited testimony
from a different witness, Mother’s father, that when Mother’s illness is not
bad enough to send her to the hospital she is a “good enough” mother to raise
her children.